**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**LAFAYETTE BUILDING AND CONSTRUCTION TRADES COUNCIL, AFL–CIO, et al., Respondents.**

No. 29722.

United States Court of Appeals, Fifth Circuit.

July 1, 1971.

---

10. See D. C. Federation of Civic Associations, Inc. v. Volpe, supra, 434 F.2d at 441, 442.

**496**

Marcel Mallet-Prevost, Asst. Gen. Counsel, Daniel M. Katz, Atty., N. L. R. B., Washington, D. C., Charles M. Paschal, Director, Region 15, N. L. R. B., New Orleans, La., for petitioner.

C. Paul Barker, Jerry L. Gardner, Jr., New Orleans, La., for respondents.

Oliver J. Butler, Jr., Obediah R. Miller, Houston, Tex., for intervenor Texaco, Inc.

Before JOHN R. BROWN, Chief Judge, and WISDOM and RONEY, Circuit Judges.

RONEY, Circuit Judge:

This is an application for enforcement of an order of the National Labor Relations Board arising out of union activities at Texaco, Inc.'s Henry Gas Processing Plant near Erath, Louisiana. In a consolidated case based upon two distinct matters, the Board found that respondent Lafayette Building and Construction Trades Council, AFL-CIO (Council) had violated Section 8(b), 4(i) and (ii) (B) of the National Labor Relations Act, as amended, and that Plasterers and Cement Masons Local Union No. 685, AFL-CIO (Plasterers) had violated Section 8(b), (4) (ii) (B) of the Act.[1] We enforce the Board's order.

* * * * *

I. 29 U.S.C. § 158(b) (4) (i) (ii) (B). "Section 8(b) (4) of the amended Act makes it an unfair labor practice for a union—

(i) to engage in, or to induce or encourage any individual * * * to engage in, a strike or refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials or commodities or to perform any services; or

(ii) to threaten, coerce, or restrain any person * * * where in either case an object thereof is:

(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person * * *: Provided, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing."

## I. Lafayette Building and Construction Trades Council

For about 2 or 3 weeks in October, 1967, a picket was parked in a truck at the corner of Parish and Boston Roads, Erath, Louisiana. A sign in the truck window read: "We are protesting substandard wages and conditions of Dresser Engineers, Lafayette Building and Trades Council." Dresser Engineering was the general contractor at the Henry Gas Plant expansion. The Henry Gas Plant was located between ¼ to ½ mile down Parish Road from the truck with the sign. A majority of workers at the construction site would pass the intersection at which the truck was parked. Dresser had a separate gate for its workers and suppliers. There was sufficient room for persons to picket at that gate and in fact pickets had done so.

Based upon these largely undisputed facts, the trial examiner found that the Council "elected to address its inducement to employees at a point passed by employees of employers other than Dresser and by so doing fell within the interdiction of the Act." The Board agreed with this finding.[2]

Section 8(b) (4) meets "the dual congressional objectives of preserving the right of labor organizations to bring pressure to bear on offending employers in primary labor disputes and of shielding unoffending employers and others from pressures in controversies not their own." N. L. R. B. v. Denver Building & Construction Trades Council, 341 U.S. 675, 692, 71 S.Ct. 943, 953, 95 L.Ed. 1284 (1951). It reflects a positive policy which developed as a result of the "great public dissatisfaction with the hapless predicament of the secondary employer caught in the middle." Superior Derrick Corp. v. N. L. R. B., 273 F. 2d 891 (5th Cir. 1960), cert. den., 364 U.S. 816, 81 S.Ct. 47, 5 L.Ed.2d 47 (1960).

It has previously been pointed out that "the line between primary and secondary activity is relatively easy to draw where the primary and secondary employers have separate work-sites." A more difficult problem is presented here where two employers are performing separate tasks on common premises. Markwell and Hartz, Inc. v. N. L. R. B., 387 F.2d 79, 86 (5th Cir. 1967) (dissenting opinion).

In order to evaluate whether picketing is permissibly primary or improperly secondary, the Board has developed criteria relating to conduct at a common situs. Sailor's Union of the Pacific (Moore Drydock Co.), 92 NLRB 547 (1950). Thus the Board stated:

"In the kind of situation that exists in this case, we believe that picketing * * * ... is primary if it meets the following conditions: (a) The picketing is strictly limited to times when the situs of the dispute is located on the secondary employer's premises; (b) At the time of the picketing the primary employer is engaged in its normal business at the situs; (c) The picketing is limited to places reasonably close to the location of the situs; and (d) The picketing discloses clearly that the dispute is with the primary employer." *Id.* at 549.

Since a common situs is involved here, the *Moore Drydock* rules are applicable. The trial examiner found, and the Board agreed, that the picketing did not conform to the *Moore Drydock* criteria in that the picketing should have been confined to the Dresser gate. Since there is undisputed evidence that Dresser had a separate gate and that there was sufficient room for picketing there, the decision of the Board is supported by substantial evidence.[3] The picketing was not "conducted in such a way that the normal appeal of the picket line [was] overcome" and was not "done

---

2. One member of the Board dissented but the dissent was based upon "the minimal nature of the violations," not upon the view that no violations occurred.

3. The record contains no evidence presented on behalf of Council.

so that all secondary employees will know that the primary union does not seek what the law forbids—pressure on the primary employer through pressure from the secondary employer because of concerted pressure of secondary employees on that secondary employer." Superior Derrick Corp. v. N. L. R. B., *supra*, 273 F.2d at p. 897; Brown Transport Corporation v. N. L. R. B., 334 F.2d 30 (5th Cir. 1964).

## II. Plasterers and Cement Masons Local Union No. 685

DuBois Concrete Works, Inc. supplied concrete to Dresser for use on the expansion of the Henry Gas Plant. From June 23, 1967 to August 8, 1967, the concrete was delivered to the Gas Plant by DuBois' trucks. At about that time Local 106, Plumbers, began picketing at the Dresser gate of the Henry Gas Plant. Thereafter DuBois made no deliveries to the Gas Plant, but instead Dresser would send its trucks to DuBois' facilities to obtain concrete, a procedure called "batching out."

Thereafter occurred a conversation between Lifey DuBois, owner of DuBois Concrete Works, and Harry Delahoussaye, business agent for Plasterers. DuBois testified that Delahoussaye came to his office between September 6 and 12, 1967, to inquire if DuBois had quit batching out. DuBois stated that Delahoussaye said that if DuBois had not stopped batching out he was going to be sorry. He further testified that Delahoussaye then mentioned different things that could happen, such as men refusing to finish cement and that other people had gone out of business for doing the same thing.

Delahoussaye testified that the conversation took place around August 29, 1967. He told DuBois that the men were disturbed about the batching of concrete for Dresser and asked his future intentions. DuBois indicated he was going to continue batching out. Delahoussaye testified that DuBois then asked what would happen if he continued batching and DuBois answered his own question by saying that the cement finishers would refuse to finish cement. Mrs. DuBois then asked if that wasn't against the law, to which Delahoussaye replied that the men could refuse as individuals but that the union could not refuse to supply men.

The trial examiner found no unfair labor practice. He thought that any violation depended almost exclusively upon the testimony of DuBois. To him the testimony was unclear and incoherent because it was given in a patois with an accent unfamiliar to the examiner. The trial examiner credited Delahoussaye's testimony.

The Board disagreed with the trial examiner, did not find the testimony of DuBois unclear and did not believe that the violation rested exclusively upon his testimony.

The question for this Court is whether on the record as a whole there is substantial evidence to support the Board's findings. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). *Universal Camera* also determined the application of that standard to the situation presented here of a finding by the Board contrary to a finding by the trial examiner. The Supreme Court stated, at p. 496, 71 S.Ct. at p. 469:

"We do not require that the examiner's findings be given more weight than in reason and in the light of judicial experience they deserve. The 'substantial evidence' standard is not modified in any way when the Board and its examiner disagree. We intend only to recognize that evidence supporting a conclusion may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the Board's than when he has reached the same conclusion. The findings of the examiner are to be considered along with the consistency and inherent probability of testimony. The significance of his report, of course, depends largely on the importance of

credibility in the particular case. To give it this significance does not seem to us materially more difficult than to heed the other factors which in sum determine whether evidence is 'substantial'."

Credibility played no significant part in the decision of the Board. The only clear credibility choice made by the trial examiner between Delahoussaye and DeBois related to who stated the consequences of continued batching out. In the Board's view that choice was immaterial to the decision. In any event, any such credibility choice made by the trial examiner could well be questioned because of his admitted inability to understand DuBois' cajun patois.

█ The Board based its finding not only upon DuBois' testimony but upon a consideration of all of the testimony.[3A] There was substantial evidence on the whole record to support the Board's finding "that Delahoussaye did threaten DuBois that respondent's members would not work his cement unless he quit batching out to Dresser, with an object of forcing or requiring DuBois to cease doing business with Dresser, and that by such conduct respondent

Plasterers violated Section 8(b) (4) (ii) (B) of the Act."

### III. Setting Aside of Informal Settlements

The Unions contend that the Board should not have set aside informal settlement agreements which would have resolved the matter without findings of unfair labor practice.

The original charges of unfair labor practice in both of these cases were filed by Texaco, Inc. on October 19, 1967. On March 13, 1968, both respondents signed the informal settlement agreements, which were approved by the Acting Regional Director of the NLRB. The agreements called for withdrawal of the complaints by the Board in return for the posting of certain notices and the refraining from certain conduct by the Unions.

Texaco, the charging party, did not execute the settlement agreements. On the contrary, on March 24, 1968, Texaco objected to the settlements but appealed to the General Counsel in accordance with Section 102.19 of the Board's Rules and Regulations.[4] The Unions were ad-

---

**3A.** Shortly after Delahoussaye's conversation with DuBois, one of DuBois' customers called DuBois and cancelled an order for cement. This was done because the area steward for Plasterers had called the customer and told him that no cement finishers would be provided to him because DuBois, his supplier, was batching out. The customer so advised DuBois, who announced that he would stop batching out. The customer and DuBois told the area steward for Plasterers of that fact and were informed that cement finishers would resume working DuBois' cement.

4. 29 C.F.R. § 102.19: "Appeal to the general counsel from refusal to issue or reissue.

(a) If, after the charge has been filed, the regional director declines to issue a complaint, or having withdrawn a complaint pursuant to § 102.18, refuses to reissue it, he shall so advise the parties in writing, accompanied by a simple statement of the procedural or other grounds for his action. The person

making the charge may obtain a review of such action by filing an appeal with the general counsel in Washington, D. C., and filing a copy of the appeal with the regional director, within 10 days from the service of the notice of such refusal to issue or reissue by the regional director, except as a shorter period is provided by § 102.81. The appeal shall contain a complete statement setting forth the facts and reasons upon which it is based. A request for extension of time to file an appeal shall be in writing and be received by the general counsel, and a copy of such request filed with the regional director, prior to the expiration of the filing period. Copies of the acknowledgment of the filing of an appeal and of any ruling on a request for an extension of time for the filing of an appeal shall be served on all parties. Consideration of an appeal untimely filed is within the discretion of the general counsel upon good cause shown.

(b) Oral presentation in Washington, D. C. of the appeal issues may be per-

vised of the appeal by letter dated March 25, 1968, from the General Counsel. On July 16, 1968, the appeal was sustained and the settlements were set aside. The Regional Director issued a new complaints on July 23, 1968, similar to the complaints which had been withdrawn. On that same day the Unions' attorney wrote the Regional Director advising that he was writing the General Counsel to request reconsideration within the 10 day period provided by Section 102.19(a) of the Board's Rules and Regulations. The letter to the General Counsel was never sent as it appeared to the Unions' counsel to serve no useful purpose in view of the reissued complaints. The Board states that the Unions' attorney advised the Regional Director on July 31 that he would not move for reconsideration.

Prior to the hearing on the unfair labor practice violations, the Unions made a motion for approval of the settlement agreements. The trial examiner referred the motion to the Board which denied the motion and remanded the matter to the trial examiner. In its exceptions, the Unions renewed the motion and the Board again refused to approve the settlements.

■ The Unions argue that the Board abused its discretion in failing to approve the agreements in that the Unions had already acted in reliance on them. Any such reliance was unjusti-

fied. The agreements were never executed by Texaco, Inc. Although such settlements can be effectuated by approval of the Board's Regional Director if no objection is made by the charging party, here the charging party appealed the approval. In such event, as stated therein, the agreements are contingent upon the General Counsel sustaining the Regional Director's action. Therefore, performance by the Unions was not required, and if begun, was clearly at the risk that the General Counsel would refuse to approve the Regional Director's action. Assuming *arguendo* that such action by the General Counsel is reviewable by this Court under Section 10(e) and (f) of the Act, 29 U.S.C. § 160(e) (f), there has been no showing of any abuse of discretion by the General Counsel or the Board.

The Unions also contend that they were denied due process because they did not receive a full hearing on the question of approval of the settlements. We see no fundamental unfairness in the proceedings complained of. The Unions presented their contentions to the Board on two occasions and the Board refused to approve the settlements. The result of such disapproval was a full hearing for all sides on the alleged unfair labor practice violations. Under the circumstances presented here, there is no violation of due process.

Enforced.

mitted a party on written request made within 4 days after service of acknowledgment of the filing of an appeal. In the event such request is granted, the other parties shall be notified and afforded, without additional request, a like opportunity at another appropriate time.

(c) The general counsel may sustain the regional director's refusal to issue or reissue a complaint, stating the grounds of his affirmance, or may direct the regional director to take further

action; the general counsel's decision shall be served on all the parties. A motion for reconsideration of the decision must be filed within 10 days of service of the decision, except as hereinafter provided, and shall state with particularity the error requiring reconsideration. A motion for reconsideration based upon newly discovered evidence which has become available only since the decision on appeal shall be filed promptly on discovery of such evidence."