**TEXACO, INC.**

v.

**OPERATIVE PLASTERERS AND CEMENT MASONS INTERNATIONAL UNION, LOCAL UNION NO. 685, AFL–CIO.**

**Civ. A. No. 13323.**

United States District Court,
W. D. Louisiana,
Lafayette Division.

May 26, 1972.

Oliver J. Butler, Jr., Houston, Tex., for plaintiff.

Dodd, Hirsch, Barker, Meunier, Boudreaux & Lamy, C. Paul Barker, New Orleans, La., for defendant.

EDWIN F. HUNTER, Jr., District Judge:

This is a suit for damages pursuant to Sections 301 and 303 of the National Labor Relations Act, as amended (hereinafter referred to as the "Act"). Plaintiff alleges that it incurred actual monetary damages as a result of certain unlawful secondary boycott activity and conduct by defendant in violation of Section 8(b) (4) (ii) (B) of the Act, and that defendant is liable to plaintiff for such damages.

The same activity and conduct of defendant which is alleged by plaintiff to have constituted an unlawful secondary boycott was the subject of unfair labor practice charges filed with the National Labor Relations Board (hereinafter referred to as the "Board") by plaintiff herein against defendant herein. And, in a decision issued on June 24, 1969, the Board held that such activity and conduct of defendant did constitute an unlawful secondary boycott in violation of Section 8(b) (4) (ii) (B) of the Act [Lafayette Building and Construction Trades Council, AFL-CIO, et al., 176 NLRB No. 137, 71 LRRM 1591]. Subsequently, in a decision issued on July 1, 1971, the United States Court of Appeals for the Fifth Circuit affirmed and enforced the decision by the Board [NLRB v. Lafayette Building and Construction Trades Council, AFL-CIO, et al., 445 F.2d 495].

The prior adjudication by the Board and the Court of Appeals with respect to defendant's unlawful secondary boycott activity and conduct being considered by this court to be res judicata as to the issue of defendant's liability in the instant cause [Painters District Council No. 38 v. Edgewood Contracting Co., 416 F.2d 1081 (CA-5, 1969); H. L. Robertson & Associates, Inc. v. Plumbers Local Union No. 519, 429 F.2d 520 (CA-5, 1970)], Judge Putnam issued an order in the instant cause on September 3, 1971, granting summary judgment to plaintiff against defendant on the issue of defendant's liability.

Thereafter, trial was had on the issue of damages on March 21, 1972.

## FINDINGS OF FACT

1. Plaintiff is a corporation doing business in Louisiana, and is now and was at all times pertinent a "person" engaged in "commerce" as defined in Sections 2(1) and 2(6) of the National Labor Relations Act, as amended. At all times pertinent plaintiff has maintained and operated a facility located near Erath, Louisiana, known as Texaco's Henry Gas Processing Plant, which plant is engaged in the processing of natural gas.

2. Defendant is a labor organization domiciled in Lafayette, Louisiana, and is now and was at all times pertinent a "labor organization" as defined in Section 2(5) of the National Labor Relations Act, as amended. Harry E. Delahoussaye and Leonard Brailey have been duly authorized officers, agents, representatives, and members of defendant.

3. During the period from on or about May 29, 1967 to on or about June 27, 1969, additional facilities were under construction at plaintiff's Henry Gas Processing Plant (hereinafter referred to as the "Henry Plant"). The general contractor for such construction was Dresser Engineering Company (hereinafter referred to as "Dresser"), whose principal office and place of business is located in Tulsa, Oklahoma. During the period of construction, Dresser main-

tained offices at the construction situs at the Henry Plant. Dresser was a "person" engaged in "commerce" or in an industry "affecting commerce" as defined in Sections 2(1), 2(6), and 2(7) of the National Labor Relations Act, as amended.

4. The contract between plaintiff and Dresser was a "cost plus fixed fee" agreement, under the terms of which plaintiff was obligated *inter alia* to reimburse Dresser for all costs incurred by Dresser for concrete purchased by Dresser for use in connection with the construction at the Henry Plant. And, pursuant to the terms of such contract, plaintiff did reimburse Dresser for all costs incurred by Dresser for concrete purchased by Dresser for use in connection with such construction—including, specifically, all costs referred to hereinafter.

In June 1967, Dresser solicited bids from concrete suppliers to furnish all concrete to be required for the construction at the Henry Plant, advising such suppliers that the construction work was expected to last for approximately one year and that it was expected that approximately 10,000 cubic yards of concrete would be required. The low bidder was DuBois Concrete Works, Inc., of Abbeville, Louisiana (hereinafter referred to as "DuBois Concrete"), which offered to supply all concrete to be required for such construction, delivered to the job site in DuBois Concrete's trucks, at the following prices per cubic yard (plus 3% Louisiana sales tax):

| | | |
|---|---|---|
| 4 | Bag Mix | $15.00 |
| 4½ | Bag Mix | 15.60 |
| 5 | Bag Mix | 16.20 |
| 5½ | Bag Mix | 16.80 |
| 6 | Bag Mix | 17.40 |

Accordingly, a verbal agreement was entered into between Dresser and DuBois Concrete for the purchase by Dresser from DuBois Concrete of all concrete required for such construction at the quoted prices.

5. At all times pertinent, DuBois Concrete was a "person" engaged in "commerce" or in an industry "affecting commerce" as defined in Sections 2(1), 2(6), and 2(7) of the National Labor Relations Act, as amended.

Pursuant to the terms of its agreement with Dresser, DuBois Concrete commenced supplying concrete to Dresser on June 23, 1967, such concrete being delivered to the Henry Plant job site by DuBois Concrete. DuBois Concrete continued to supply concrete to Dresser on such basis through August 9, 1967.

Because it did not wish to cross a picket line placed at the Henry Plant job site by a labor union not involved in this cause, DuBois Concrete refused to deliver concrete to the job site after August 9, 1967. However, DuBois Concrete did agree to continue supplying concrete to Dresser by loading Dresser trucks at DuBois Concrete's plant in Abbeville if Dresser would obtain concrete trucks for its own use.

As a result, Dresser leased concrete trucks. And, on August 21, 1967, DuBois Concrete commenced supplying concrete to Dresser by loading Dresser trucks at DuBois Concrete's plant—a procedure referred to as "batching out." Upon commencement of this new supply procedure, new prices were verbally agreed upon by Dresser and DuBois Concrete to reflect the fact that the concrete was not being delivered to the job site by DuBois Concrete. Such new prices were as follows, per cubic yard (plus 3% Louisiana sales tax):

| | | |
|---|---|---|
| 4 | Bag Mix | $14.00 |
| 5 | Bag Mix | 15.13 |
| 6 | Bag Mix | 16.26 |

6. The National Labor Relations Board found that: after DuBois had commenced supplying concrete to Dresser by "batching out" at DuBois Concrete's plant, defendant's agent, Harry E. Delahoussaye, came to DuBois Concrete's plant and talked with Lifey DuBois, President of DuBois Concrete. Such visit and conversation occurred sometime on or after August 29, 1967, and prior to September 7, 1967. Delahoussaye inquired whether DuBois was "batching out" concrete to Dresser, and

if so, whether DuBois intended to continue doing so. DuBois replied that he was "batching out" concrete to Dresser and intended to continue doing so. Delahoussaye thereupon advised DuBois that he would be sorry if he continued to do so. Delahoussaye further informed DuBois that the cement finishers might refuse to work on jobs using concrete furnished by DuBois, and stated that other firms which had supplied concrete in opposition to the Union's desires had been forced to go out of business.

Thereafter, on September 7, 1967, defendant's agent, Leonard Brailey, was contacted by George Trahan, Manager of Southside Lumber and Supply Company, of Abbeville (hereinafter referred to as "Southside"), and was requested to furnish cement finishers for a construction job being conducted by Southside. The concrete for such job was to be supplied by DuBois Concrete. When contacted, Brailey agreed to furnish the requested cement finishers. However, a few minutes later, Brailey telephoned Trahan and advised that Trahan's request for cement finishers could not be honored because DuBois Concrete was "batching out" concrete to Dresser. Trahan immediately advised DuBois Concrete of Brailey's comments and stated that as a result Southside would have to cancel its order for concrete from DuBois Concrete.

After being advised by Trahan of Brailey's comments, DuBois Concrete decided to cease supplying concrete to Dresser. Such decision by DuBois Concrete was based on a determination that DuBois Concrete could not operate its business if the cement finishers would not work on concrete supplied by it.

Both Trahan and Brailey were advised by Lifey DuBois of DuBois Concrete's decision to cease supplying concrete to Dresser. And, upon being so advised, Brailey thereupon agreed to furnish cement finishers for the concrete to be supplied by DuBois Concrete for the Southside job. Delahoussaye was also advised by Lifey DuBois of DuBois Concrete's decision to cease supplying concrete to Dresser. And, upon being so advised, Delahoussaye assured DuBois that cement finishers would be furnished for the Southside job. Thereafter, work on the Southside job proceeded without difficulty.

7. Later in the day, on September 7, 1967, Dresser was informed of DuBois Concrete's decision to cease supplying concrete to Dresser. And, no concrete was supplied to Dresser by DuBois Concrete on or after September 7, 1967.

As a result of DuBois Concrete's action in refusing to continue supplying concrete, Dresser contacted other concrete suppliers within the South Louisiana area in an attempt to secure concrete. However, all of the suppliers contacted refused to furnish concrete to Dresser for the job.

After such unsuccessful contacts with the concrete suppliers in the area, Dresser received a proposal from Roy Young, Inc., of Abbeville (hereinafter referred to as "Young"), to supply concrete for the job. Young proposed to rent and operate a concrete plant, solely to supply Dresser, on a cost-plus-10% basis. And, as a condition of such proposal, Young insisted upon assurance that such arrangement endure for at least 12 months—taking the position that it would not be sufficiently profitable to Young to undertake such arrangement for a shorter period of time.

8. Dresser recognized that its costs for concrete would be substantially increased if it agreed to Young's proposal. However, being of the opinion that concrete was not available to it from any other source, Dresser determined that the arrangement proposed was reasonable under the circumstances.

Dresser and Young entered into a verbal agreement whereby Young would rent, install and operate a concrete plant for the sole purpose of supplying concrete to Dresser with all costs incurred by Young in connection therewith being reimbursed by Dresser, plus a 10% fee

to Young, with the land upon which such concrete plant was to be installed to be rented from Young at an agreed upon cost, and with certain equipment to be used in connection with such operation to be rented from Young at an agreed upon cost. Under the terms of such agreement, the concrete would be "batched out" to Dresser's trucks at the plant operated by Young, rather than be delivered by Young to the job site. And, as insisted upon by Young, it was agreed that such arrangement would extend for a minimum period of 12 months.

Pursuant to such agreement between Dresser and Young, Young proceeded to rent and install a concrete plant. And, Young commenced supplying concrete to Dresser on October 2, 1967.

In the meantime, during the period between September 7 and October 2, 1967, Dresser had rented a small concrete mixer and "field mixed" 338.25 cubic yards of 5½ Bag Mix concrete on the job site. The costs to Dresser for such concrete amounted to $6,532.19. Had such concrete been obtained from DuBois Concrete at the agreed upon prices in effect when DuBois Concrete ceased supplying on September 7, 1967, the costs to Dresser for such concrete would have been $5,846.90. Thus, the additional costs incurred by Dresser in obtaining such concrete amounted to $685.29.

Young supplied concrete to Dresser pursuant to the terms of the aforementioned agreement from October 2, 1967 until August 27, 1968. During such period, Young supplied 24 cubic yards of 5½ Bag Mix concrete, 1,387.5 cubic yards of 6 Bag Mix concrete, 5,653 cubic yards of 6½ Bag Mix concrete, and 3,381.5 cubic yards of 6¾ Bag Mix concrete. The costs incurred by Dresser for such concrete amounted to $239,855.-37. Had such concrete been obtained from DuBois Concrete at the agreed upon prices in effect when DuBois Concrete ceased supplying on September 7,

1967, the costs to Dresser for such concrete would have been $181,175.11. Thus, the additional costs incurred by Dresser in obtaining such concrete amounted to $58,680.26.

At the behest of Dresser, the aforementioned agreement between Dresser and Young was terminated on August 27, 1968. And, effective August 28, 1968, Young agreed to supply concrete to Dresser at an agreed upon price per cubic yard, with such concrete still to be "batched out" to Dresser's trucks at Young's plant, and with it being agreed that Young would still furnish concrete solely for Dresser. The agreed upon price per cubic yard was as follows (plus 3% Louisiana sales tax):

| 4 | Bag Mix | $21.92 |
|---|---|---|
| 4½ | Bag Mix | 22.28 |
| 5 | Bag Mix | 22.46 |
| 5½ | Bag Mix | 22.83 |
| 6 | Bag Mix | 22.97 |
| 6½ | Bag Mix | 23.34 |
| 6¾ | Bag Mix | 23.54 |

Young supplied concrete to Dresser at the prices noted above from August 28, 1968 until April 24, 1969. During such period, Young supplied 83 cubic yards of 5½ Bag Mix concrete and 991 cubic yards of 6¾ Bag Mix concrete. The costs incurred by Dresser for such concrete amounted to $25,979.70. Had such concrete been obtained from DuBois Concrete at the agreed upon prices in effect when DuBois Concrete ceased supplying on September 7, 1967, the costs to Dresser for such concrete would have been $18,803.90. Thus, the additional costs incurred by Dresser in obtaining such concrete amounted to $7,-075.80.

Effective April 25, 1969, Young entered into the business of supplying concrete to the general public. And, on such date, Young commenced supplying concrete to Dresser by delivery to Dresser's job site in Young's trucks, rather than by "batching out" to Dresser's trucks. A new price per cubic yard was agreed upon, based on delivery by

Young, as follows (plus 3% Louisiana sales tax):

| 4 | Bag Mix | $24.00 |
| 4½ | Bag Mix | 24.75 |
| 5 | Bag Mix | 25.50 |
| 5½ | Bag Mix | 26.25 |
| 6 | Bag Mix | 27.00 |
| 6½ | Bag Mix | 27.75 |
| 6¾ | Bag Mix | 28.13 |

The charts show that Young supplied concrete to Dresser by delivery to the job site at the prices noted above from April 25, 1969 until June 27, 1969. During such period, Young supplied 12 cubic yards of 4 Bag Mix concrete, 15 cubic yards of 4½ Bag Mix concrete, 334 cubic yards of 5½ Bag Mix concrete, 23.5 cubic yards of 6 Bag Mix concrete, 11 cubic yards of 6½ Bag Mix concrete, and 96 cubic yards of 6¾ Bag Mix concrete. The costs incurred by Dresser for such concrete amounted to $13,459.08. Had such concrete been obtained from DuBois Concrete at the agreed upon prices in effect when DuBois was delivering concrete to the job site prior to August 9, 1967, the costs to Dresser for such concrete would have been $8,640.57. Thus, the additional costs incurred by Dresser in obtaining such concrete amounted to $4,818.51.

From the foregoing, it is apparent that the total costs incurred by Dresser for concrete during the period from September 7, 1967 to June 27, 1969 amounted to $285,826.34. Had such concrete been obtained from DuBois Concrete at the agreed upon prices in effect prior to September 7, 1967, the total costs to Dresser would have been $214,466.48. Thus, the total additional costs incurred by Dresser in obtaining concrete after September 7, 1967 amounted to $71,359.-86.

9. The contract between Dresser and Young was renegotiated twice in 1969, each time upwards. There was no explanation for the constantly increasing cost apparently beyond the competitive market of the exclusive supplier, Roy Young. Dresser made no apparent effort to minimize the cost of the supply of concrete. After the charges before the NLRB were filed and defendant had entered into a settlement publicly advising the government and all other parties that it would cease and desist from any conduct deemed unlawful, no effort was made to rearrange or to obtain concrete from different suppliers at a lower cost.

Dresser "field mixed" the concrete between September 7, 1967, and October 2, 1967, at prices 11.72% above the contract price with DuBois Concrete. Given the above factors, we feel that this increase reflects most equitably the overall increase to Dresser. In addition, we conclude that the upward revision of the contract with Young, effective April 25, 1969, severed all damages for which the defendants could be held responsible. We are persuaded that an equitable award in this case would be 11.72% of $205,825.91, or $24,122.80.

## CONCLUSIONS OF LAW

1. This Court considers the adjudications previously made by the Board and the United States Court of Appeals for the Fifth Circuit that such actions and conduct constituted an unlawful secondary boycott in violation of Section 8(b) (4) (ii) (B) of the Act to be res judicata.[1]

2. Defendant contends that even though the prior adjudications be considered res judicata as to its actions and conduct constituting an unlawful secondary boycott, such prior adjudications are not res judicata as to its liability for any damages incurred by plaintiff since neither the Board nor the Court of Appeals found that DuBois Concrete ceased supplying concrete to Dresser *because* of defendant's unlawful actions. Defendant further contends that there is no

---

1. This Court, or a jury unhampered, might not have found as the Board did that Delahoussaye threatened DuBois with an object of forcing or requiring DuBois to cease doing business with Dresser and that by such conduct respondent Plasterers violated Section 8(b) (4) (ii) (B) of the Act.

evidence of record to support a finding that DuBois Concrete ceased supplying concrete to Dresser *because* of defendant's unlawful actions, and that absent such evidence it cannot be found to have any liability for any damages incurred by plaintiff.

This Court finds no merit in such contentions of defendant. First of all, in the opinion of this Court, the Board did, in fact, find that DuBois Concrete ceased supplying Dresser *because* of defendant's unlawful actions. And, this Court therefore considers the Board's decision to be res judicata as to defendant's liability for resultant damages. The following excerpts from the Board's decision seem to this Court to be dispositive on such point:

" * * * On September 7, 1967, and just shortly after Delahoussaye's visit to DuBois, the Southside Lumber and Supply, Inc., a customer of DuBois, placed an order for cement with DuBois and called respondent Plasterers' agent, Brailey, to secure certain cement finishers. Southside's general manager, Trahan, testified that Brailey agreed to honor the request for cement finishers when first contacted. He further testified, however, that a few minutes later Brailey advised Trahan that his earlier request could not be honored because DuBois was batching out concrete to Dresser. Trahan then contacted DuBois and advised him that he was obliged to cancel the order and he informed DuBois of the reason for Brailey's refusal to furnish the cement finishers. DuBois immediately advised Trahan that he would cease batching out to Dresser which, in fact, he did that very day * * *."

" * * * [W]hen a union causes a secondary employer to cease doing business with a primary employer, as in the present case, that conduct constitutes a secondary boycott of the type which Section 8(b) (4) (B) was intended to proscribe * * *."
(Emphasis added)

3. The plaintiff urges on us the proposition that the plaintiff should not be required to minimize its damage since this was a willful tort. Economic action in any labor dispute is intentional and willful. It becomes illegal only when so defined by law or when carried out in an unlawful manner or for unlawful purposes. This action of defendant for the purposes as found by the Labor Board whether willful or not, was unlawful only because of the statute. Plaintiff clearly has the duty to minimize damages if it is reasonably possible to do so. Vulcan Materials Co. v. United Steelworkers of America (5th Cir., 1970), 430 F.2d 446.

Where the activity of the defendant union has ceased, the defendant cannot be held responsible for continued loss not occasioned by its actions. Thus in Ritchie v. United Mine Workers of America, supra, the Sixth Circuit said at 410 F.2d 836:

"In the event of a new trial under § 303 of the LMRA we hold that proof of damages should be limited to those which are the direct and proximate result of the secondary boycott. Gilchrist v. UMW, supra. The secondary boycott took place during the time of picketing. All picketing had ceased April 30, 1959, long prior to the burning of the tipple. Thus under the facts of this case, the loss of the tipple and the resulting loss of profits are not a part of the measure of damages against the UMW resulting from the secondary boycott."

4. Plaintiff is awarded judgment against defendant in the sum of $24,122.80, together with costs and legal interest from date of judicial demand.