**T. W. HELGESEN, Plaintiff-Appellant,**

**v.**

**INTERNATIONAL ASSOCIATION OF BRIDGE, STRUCTURAL & ORNAMENTAL IRONWORKERS, · LOCAL UNION 498, Defendant-Appellee.**

**No. 76–1571.**

United States Court of Appeals, Seventh Circuit.

Argued Oct. 26, 1976.

Decided Jan. 6, 1977.

As Amended Jan. 7, 1977.

---

Gerald C. Nichol, Madison, Wis., for plaintiff-appellant.

David Leo Uelmen, Walter F. Kelly, Milwaukee, Wis., for defendant-appellee.

Before FAIRCHILD, Chief Judge, MOORE, Senior Circuit Judge,* and WOOD, Circuit Judge.

HARLINGTON WOOD, Jr., Circuit Judge.

In this case plaintiff-appellant T. W. Helgesen, Inc. (hereinafter referred to as plaintiff) is appealing a lower court decision which held that picketing conducted by defendant-appellee International Association of Bridge, Structural & Ornamental Iron-workers, Local Union 498 (hereinafter referred to as defendant) was primary activity rather than an actionable secondary boycott.

For the following reasons we affirm the lower court decision.

### I.

A summary of the relevant facts based upon the lower court's findings of fact follows.

Rath Manufacturing Co., Inc., a Wisconsin corporation with its principal offices and facilities in Janesville, Wisconsin, is engaged in stainless steel fabrication for the food and dairy industry.

In 1974, Rath Manufacturing acted as its own general contractor for the construction in Janesville of a 60,000 square foot manufacturing facility. The job site was located on Foster Road,[1] approximately 600 to 700 feet from Kennedy Highway. Virgil Rath, an employee of Rath Manufacturing, acted as the company's principal representative on the job site.

Rath Manufacturing contracted with Bob Kimball, Inc. to put in a concrete foundation. Karl Gould, an employee of Bob Kimball, Inc., was the foreman of the Kimball employees on the Rath Manufacturing job. Lycon, Inc., supplied concrete to Kimball for this job.

Rath Manufacturing also contracted with plaintiff to erect a steel frame, steel roof and steel siding on the concrete work put in by Bob Kimball, Inc.

Defendant union represents members who do the same type of craft work as the employees of plaintiff. Plaintiff's employees, however, did not belong to a union. Prior to June, 1974, defendant had been engaged in a labor dispute with plaintiff

---

* The Honorable Leonard P. Moore of the United States Court of Appeals for the Second Circuit is sitting by designation.

1. The lower court refers both to Foster Road and Foster Avenue. We will hereafter refer to the unmarked dirt road as Foster Road.

and had conducted primary picketing of plaintiff at various job sites where plaintiff was then engaged. Defendant at no time material to this case was engaged in a labor dispute with Rath Manufacturing, Inc., Bob Kimball, Inc., or Lycon, Inc.

Prior to June 17, 1974, plaintiff's employees unloaded metal building materials on the Rath job site. On June 17, 1974, plaintiff's employees commenced the steel erection work.

The defendant on June 19, 1974, began picketing the Rath Manufacturing job site. The picket line was positioned at the juncture of Kennedy Highway and Foster Road. Foster Road was an unmarked gravel road which had been dedicated as a public road one and one-half years prior to the initiation of the Rath Manufacturing project.

The picketing was authorized by George Chabucos, business agent, financial secretary, and treasurer of defendant union. Chabucos placed John Koebler, Sr., in charge of the picketing. As chief picket, John Koebler, Sr., enlisted as pickets his sons Brian and John, Jr.

Chabucos gave John Koebler, Sr., a primary worded area standard picket sign[2] and express picketing instructions.[3]

The picketing was timed to reflect the presence of Helgesen employees on the job.

Although the picket sign asserted that plaintiff was paying substandard wages, defendant conducted no actual investigation into plaintiff's wages, fringe benefits, or other conditions of employment.

Separate entrances were established on June 20, 1974, from Foster Road onto the job site. Entrance No. 1 was designated for exclusive use by employees and suppliers of plaintiff. Entrance No. 2 was designated for use by employees and suppliers of other employers.[4]

Plaintiff formally notified defendant about the separate entrances by sending a certified letter dated June 20, 1974, to defendant. Defendant received the letter on June 24, 1974. John Koebler, Sr., however, was aware of the separate entrances well before the defendant received the letter from plaintiff.

Pursuant to directions from John Koebler, Sr., the defendant picketed in the area of the intersection of Kennedy Highway and Foster Road. The defendant did not confine its picketing to the gates designated for employees and suppliers of plaintiff.

On the morning of June 25, 1974, John Campbell, an unemployed member of defendant union, was standing with the authorized pickets. When Karl Gould, foreman of Bob Kimball, Inc., arrived at the job site, John Campbell made a short statement to Gould about how union men should honor picket lines. Campbell's statement was "spiced up with plenty of curse words."

Later in the day on June 25, 1974, a group of ironworkers followed Campbell onto the job site. Two of plaintiff's employees were injured in a fight with Campbell and the ironworkers.

Brian Koebler followed Campbell and the ironworkers onto the job site. As Brian Koebler passed Virgil Rath, Koebler had a short conversation with Rath. According to Rath, Koebler:

. . . threatened me, told me that the only reason why he didn't total me out right at that particular point was that I

---

**2.** The picket sign stated:
T. W. Helgesen, Inc. is working on this job with labor receiving less than prevailing Ironworkers Local Union 498, AFL–CIO rates. This sign is not directed at the Employees of this company or the Employees of any other Employer servicing this job, but solely at the public.

**3.** The instructions provided:
Picket only when the employees of the contractor are working. Picket as close to the job site as possible without trespassing. Do not block any entrances. Avoid conversation with any-

one. Keep moving at all times. Refer all questions by pointing to the sign. Refer any problems to the business agent.

**4.** A sign posted at Entrance No. 1 stated:
This entrance *exclusively* for employees and suppliers of *T. W. Helgesen, Inc.* All other persons may not use this entrance.
A sign posted at Entrance No. 2 stated:
This entrance *may not* be used by employees and suppliers of *T. W. Helgesen, Inc.* All other persons may use this entrance.

was so damned old. Those were his words. And then he went ahead and just said a number of other things, like that this was all my fault, this eruption, and it was due to my hiring cheap labor at two dollars an hour, that I could drive the Continental that I was driving, and he went on and on with a lot of this kind of talk. And finally he left and went over to where they were scuffling.

In order to get the attention of the men and break up the fight, Koebler broke a window on one of plaintiff's trucks.

Shortly after this incident, the police, city attorney, city engineer, Chabucos, Koebler, Sr., and T. W. Helgesen met to determine whether Foster Road was a designated public road which could be used by the picketers. Upon ascertaining that Foster Road was a designated public road, the picket line was moved to a site on Foster Road near the Helgesen entrance.

Kimball employees remained off the job for the remainder of June 25, 1974.

Rath decided late on June 25 that plaintiff should go off the job until Kimball completed the concrete work. Kimball agreed with the plan. Plaintiff resisted the plan but abided by Rath's decision.

After plaintiff was temporarily removed from the job, defendant withdrew its picket line.

The district court held that the actions of John Campbell, John Koebler, Sr., John Koebler, Sr.'s sons, and George Chabucos were the acts of defendant. Although defendant's activity was intentionally coercive of both Rath Manufacturing and Kimball, Inc., and successfully disrupted their business relationships with plaintiff and each other, the lower court concluded that the defendant's concerns were clearly primary in every respect.

Plaintiff argues on appeal that the lower court failed to give proper weight to findings of fact evidencing a secondary object by defendant. Specifically, plaintiff points to the following findings by the lower court as evidencing secondary object: 1) although

notice had been received by defendant through John Koebler, Sr., that plaintiff had established separate entrances, defendant failed to confine picketing to the Helgesen gate; 2) defendant failed to investigate the pay, fringe benefits, and conditions of employment paid by Helgesen to its employees prior to commencement of picketing; 3) defendant was responsible for John Campbell's coercive and threatening conduct which resulted in Gould pulling the Kimball crew off the job; and 4) Virgil Rath was threatened by Brian Koebler. Plaintiff further asserts that even if secondary activity was incidental to primary activity, an action pursuant to § 303 of the National Labor Relations Act, 29 U.S.C. § 187, would nonetheless be available.

Defendant argues that the lower court properly found that defendant's conduct was in all respects primary activity directed at plaintiff. Defendant asserts further that even if the lower court opinion can be read as holding that aspects of defendant's behavior were secondary, the district judge expressly found that defendant acted without secondary object.

## II.

Section 8(b)(4)(B) of the National Labor Relations Act, 29 U.S.C. § 158(b)(4)(B), provides in part that it shall be an unfair labor practice for a union or its agent:

(i)  .  .  . to induce or encourage any individual employed by any person .  .  . to engage in, a strike .  .  ., or

(ii) to threaten, coerce, or restrain any person  .  .  . where in either case an object thereof is—

    \*    \*    \*    \*    \*    \*

(B) forcing or requiring any person .  .  . to cease doing business with any other person  .  .  .: *Provided*, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any  .  .  . primary picketing.

Section 303 of the National Labor Relations Act, 29 U.S.C. § 187, incorporates by reference the prohibitions embodied in § 8(b)(4) and provides a basis for a civil action for damages cognizable in either federal or state court.[5] *Local 20, Teamsters Union v. Morton*, 377 U.S. 252, 258–9 n. 13, 84 S.Ct. 1253, 12 L.Ed.2d 280 (1964); *Local 501, Electrical Workers v. Labor Board*, 341 U.S. 694, 702, 71 S.Ct. 954, 95 L.Ed. 1299 (1951).

Section 8(b)(4) seeks to implement " 'the dual congressional objectives of preserving the right of labor organizations to bring pressure to bear on offending employers in primary labor disputes and of shielding unoffending employers and others from pressures in controversies not their own.' *National Labor Relations Board v. Denver Bldg. & Const. Trades Council*, 341 U.S. 675, 692 [71 S.Ct. 943, 953, 95 L.Ed. 1284] (1951)." *Woodwork Manufacturers v. NLRB*, 386 U.S. 612, 626–7, 87 S.Ct. 1250, 1259, 8 L.Ed.2d 357 (1967). The purpose of § 8(b)(4)(B) is explained in *NLRB v. Local 825, Operating Engineers*, 400 U.S. 297, 302–3, 91 S.Ct. 402, 406, 27 L.Ed.2d 398 (1971):

Congressional concern over the involvement of third parties in labor disputes not their own prompted § 8(b)(4)(B). This concern was focused on . . . pressure brought to bear, not "upon the employer who alone is a party [to a dispute], but upon some third party who has no concern with it" with the objective of forcing the third party to bring pressure on the employer to agree to the union's demands.

Section 8(b)(4)(B) is, however, the product of legislative compromise and also reflects a concern with protecting labor organizations' right to exert legitimate pressure aimed at the employer with whom there is a primary dispute. (footnotes omitted).

"The line between legitimate 'primary' activity directed against the offending employer and unlawful 'secondary' activity directed against the neutral employer with whom the union has no dispute is often difficult to discern in a 'common situs' case such as presented here." *NLRB v. Local 307, Plumbers, Etc.*, 469 F.2d 403, 407 (7th Cir. 1972). The difficulty in distinguishing between legitimate and proscribed picketing is complicated by the fact that "objectives of any picketing include a desire to influence others from withholding from the employer their services or trade," *Electrical Workers*, 366 U.S. 667, 673, 81 S.Ct. 1285, 6 L.Ed.2d 592 (1961). The Court in *Electrical Workers, supra*, stated:

"It is clear that, when a union pickets an employer with whom it has a dispute, it hopes, even if it does not intend, that all persons will honor the picket line, and that hope encompasses the employees of neutral employers who may in the course of their employment (deliverymen and the like) have to enter the premises." *Id.* [*Seafarers International Union, etc., v. N. L. R. B.*, 105 U.S.App.D.C. 211, 265 F.2d 585] at 591. "Almost all picketing, even at the situs of the primary employer and surely at that of the secondary, hopes to achieve the forbidden objective, whatever other motives there may be and however small the chances of success." *Local 294, supra* [*N. L. R. B. v. Local 294, International Brotherhood of Teamsters*, 2 Cir., 284 F.2d 887] at 890. But picketing which induces secondary employees to respect a picket line is not the equivalent of picketing which has an object of inducing those employees to engage in concerted conduct against their employer in order

---

5.  Section 303 provides:

(a) It shall be unlawful, for the purpose of this section only, in an industry or activity affecting commerce, for any labor organization to engage in any activity or conduct defined as an unfair labor practice in section 158(b)(4) of this title.

(b) Whoever shall be injured in his business or property by reason of any violation of subsection (a) of this section may sue therefore in any district court of the United States subject to the limitations and provisions of section 185 of this title without respect to the amount in controversy, or in any other court having jurisdiction of the parties, and shall recover the damages by him sustained and the cost of the suit.

to force him to refuse to deal with the struck employer . . .

366 U.S. at 673–4, 81 S.Ct. at 1289.[6] "However difficult the drawing of lines more nice than obvious, the statute compels the task." *Electrical Workers,* 366 U.S. at 674, 81 S.Ct. at 1290.

■ Objective criteria have been developed by the NLRB and applied by the courts to assist in determining whether picketing has been conducted in a way least calculated to induce secondary effects. In *Sailors' Union of the Pacific* (Moore Dry Dock), 92 N.L.R.B. 547 (1950), the Board set out four standards for picketing in common situs situations: (1) that the picketing be limited to times when the situs of dispute was located on the secondary premises, (2) that the primary employer be engaged in his normal business at the situs, (3) that the picketing take place reasonably close to the situs, and (4) that the picketing clearly disclose that the dispute was only with the primary employer. Although observance of the *Moore Dry Dock* standards is presumptive of valid activity, they should not be applied mechanically. *Electrical Workers,* 366 U.S. at 677, 81 S.Ct. 1285; *Local 307, Plumbers, Etc.,* 469 F.2d at 408. Even if the *Moore Dry Dock* standards are satisfied, the totality of the union's conduct must be examined to determine whether a secondary object is present. *Local 307, Plumbers, Etc.,* 469 F.2d at 408.

In the present case, appellant argues both that the *Moore Dry Dock* standards have not been satisfied and that the union's conduct reveals a secondary objective.

An examination of each of the findings of the lower court which plaintiff argues evidences a secondary object, however, does not demonstrate that defendant had a proscribed purpose.

1. UNION PICKETING

■ The trial court in paragraph 22 of its Findings of Fact stated:

22. Defendant conducted no actual investigation of the wages, fringe benefits, or other conditions of employment of plaintiff's employees, during June of 1974, or at any other time material herein, though the picket sign asserted plaintiff's substandard wages and working conditions. George Chabucos explained this by stating:

The investigation made is generally the feedback from what we call the legitimate contractor who bids the job. * * So that as far as the union is concerned, the burden, if we put an information picket on the contractor with that information, then the burden would be on the—on that particular employer to prove to us that he pays the same amount of money to his employees that our legitimate—what we call legitimate contractor pays to his employees.

Chabucos conceded that the fact that Helgesen was non-union was a consideration.

Plaintiff argues based upon this finding of fact that defendant's picketing was a sham and evidenced secondary intent.

Plaintiff relies on *Lawhon Const. Co. v. Carpet, L. & R.F.D., Local 1179,* 394 F.Supp. 520 (W.D.Mo.1973), aff'd, 8 Cir., 513 F.2d 723, to support its assertion that the picketing was sham picketing. In *Lawhon Const. Co.* the court found that the union had no reasonable basis for believing that area standards were being broken down and that the objective underlying the area standards picketing was secondary. The court based its conclusion on the following factors: 1) the business manager of the defendant union did not know what wage rate or bene-

---

**6.** The Court in *Railroad Trainmen v. Terminal Co.,* 394 U.S. 369, 386–7, 89 S.Ct. 1109, 1120, 22 L.Ed.2d 344 (1969), recognized the difficulty in delineating with precision the difference between hope and intent:

No cosmic principles announce the existence of secondary conduct, condemn it as an evil, or delimit its boundaries. These tasks

were first undertaken by judges, intermixing metaphysics with their notions of social and economic policy. And the common law of labor relations has created no concept more elusive than that of "secondary" conduct; it has drawn no lines more arbitrary, tenuous, and shifting than those separating "primary" from "secondary" activities.

fits were being received; 2) the business manager of the defendant union told the construction superintendent that the pickets would be removed only after the employees of Carpet Services, the alleged violator of area standards, left the job; and 3) nothing in the record evidenced a belief that substandard wages were being paid.

*Lawhon Const. Co.,* is, however, distinguishable from the present case. For example, Chabucos testified that his belief concerning substandard wages was based upon feedback from "legitimate" contractors bidding on the same job as plaintiff. Chabucos stated:

> The investigation we do is generally the feedback from what we call the legitimate contractor who bids the job. Will [sic] say he bids an erection job for $10,-000, based upon paying the union rate. If T. W. Helgesen comes in on the same job, bids it at a rate that would be—I mean a contract price for the same erection, the identical work at $5,000, we, therefore, have to assume that he cannot possibly be paying the same kind of sale [sic], otherwise he'd be in competition—in close competition with our contractors that did it. (Tr. 88)

Thus, the record contains a not insubstantial basis for the union to believe that area standards were being violated. In addition, plaintiff has not introduced evidence to rebut the reasonableness of the union's belief based upon feedback from other contractors. Similarly, defendant at no time told Rath Manufacturing, the general contractor, that the picket line would be removed only if plaintiff's employees were removed from the job. Consequently, there is no basis for concluding that the union was conducting "sham" picketing with a secondary object.

■ Plaintiff also points as evidence of secondary object to the trial court's finding that defendant failed to confine picketing to the entrance established for use by plaintiff's employees and suppliers. Plaintiff ar-

gues that defendant conducted its picketing in the area of Kennedy Highway and Foster Road in order to broadly appeal to the employees and suppliers of the neutral companies. Thus, plaintiff asserts that the positioning of the picketing indicates that defendant acted with a secondary object.

The trial court found that John Koebler, Sr., knew that separate entrances had been established prior to June 24, 1974, the date on which Chabucos received formal notice on behalf of the defendant. (Finding of Fact Para. 20.) The lower court also found that despite knowledge that separate entrances had been established, defendant failed to confine picketing to the gates designated for use by employees and suppliers of plaintiff. The court found that "defendant maintained its picketing under directive from Koebler, Sr., at the area of intersection of Kennedy Highway and Foster Avenue." (Finding of Fact Para. 24.)

Although stating in its Findings of Fact that defendant failed to confine its picketing to the gate set aside for plaintiff's employees and suppliers, the lower court concluded that the picketing was valid area standards picketing directed at plaintiff, the primary employer. (Conclusions of Law Para. 2.)[7] Thus, the district court found that failure to confine picketing under the circumstances of this case does not indicate that defendant acted with a secondary object. For the following reasons, we agree.

In order to conform with *Moore Dry Dock* criteria, picketing should be confined to the gate set aside for the primary employer. *Markwell & Hartz, Inc. v. NLRB,* 387 F.2d 79 (5th Cir. 1967), *cert. denied,* 391 U.S. 914, 88 S.Ct. 1808, 20 L.Ed.2d 653; *NLRB v. Lafayette Building & Const. Trades Council,* 445 F.2d 495 (5th Cir. 1971). Thus, it is clear that defendant in failing to confine its picketing did not satisfy the above requirement. As we have indicated, however, the objective test set forth in *Moore Dry Dock* should not be mechanically applied. *Electrical Workers,* 366 U.S. at

---

**7.** Paragraph 2 of the Conclusions of Law provides:

2. The union's picket, as such, was in design a legally valid area-standards picket directed at its primary disputant, Helgesen.

677, 81 S.Ct. 1285; *Local 307, Plumbers, Etc.*, 469 F.2d at 408. An examination of the totality of the union's conduct in conducting the picketing does not demonstrate that defendant had a secondary object.

First, it is important to note that defendant satisfied the *Moore Dry Dock* criteria in the following respects: 1) picketing was conducted only when plaintiff's employees were on the job site; 2) plaintiff's employees were engaged in their normal business, erecting steel, on the job site; and 3) signs carried by the pickets clearly publicized the fact that the dispute was with plaintiff. In addition, instructions handed out to the pickets by defendant further indicate that defendant was directing the picketing at plaintiff.

Considerable confusion surrounds the placement of the pickets. The picketing was begun at the intersection of Kennedy Highway and Foster Road (Tr. 89, 99) and was being conducted at that location on the morning of June 25, 1974 (Tr. 10, 101). Prior to the meeting with the police, city attorney, city engineer and plaintiff on June 25, 1974, it appears that defendant was uncertain as to whether Foster Road was a dedicated public road and whether picketing could be conducted on Foster Road near the job site entrances (Tr. 93, 99). As Chabucos testified, Foster Road did not look like a dedicated road:

> . . . It looked like a gravel road into a garden on one end and into the—well, there was a turn that the dirt went into the garage next to the building site. No street sign except for the Kennedy road. In fact there was a street sign there that said "Kennedy Road." There was no street sign at that intersection (Tr. 91).

After the meeting on June 25, 1974, which established that Foster Road was a dedicated road, the picket line was moved to Foster Road near plaintiff's gate. When plaintiff's crew was taken off the job pending completion of the concrete work by Kimball, defendant removed the picket line.

We cannot say that failure to confine the picketing to plaintiff's gate in such circumstances indicates that defendant acted with a proscribed secondary object.[8]

## 2. ALLEGED COERCION OF NEUTRAL BOB KIMBALL, INC.

On the morning of June 25, 1974, John Campbell, an out of work ironworker and member of defendant union, was standing with the defendant's pickets on Kennedy Highway and Foster Road. Campbell was not an authorized picket. As Kimball foreman Karl Gould arrived for work at 8:00 or 9:00 a.m., Campbell appealed to Gould to honor the picket line. Gould testified:

> Well, I always passed the time of day—I knew most of them boys—when I drove in and this particular morning Johnny Campbell made a little speech to me about being a good union member and by rights we should be honoring their pickets and not go to work there. And he was spicing this up with plenty of curse words, and I got some hotheaded lads on my crew. So rather than have them boys maybe listen to the same speech and have some trouble, I took my people and went home (Tr. 12).

The lower court ruled first that the defendant was responsible for the acts of Campbell:

> Even though without specific and formal direction or ratification of such action, and even though violative of the formal written instructions issued to the pickets, the defendant, through Koebler, Sr., the surrogate on this project of its duly constituted official Chabucos, watched Campbell drive Kimball's men off the job

---

**8.** Although the trial court found that defendant "maintained" its picketing at the intersection of Kennedy Highway and Foster Road, defendant correctly points out that the record contains conflicting testimony on this point. There is some evidence in the record that picketing may have been conducted for a short time at the plaintiff's gate on Foster Road and then was moved back to Kennedy Highway and Foster Road because the defendant believed that plaintiff's employees were using the entrance set aside for neutral employees. Even if we credited such testimony, this would further indicate that the placement of pickets was not undertaken with a secondary object.

by forcefully telling their supervisor they didn't belong there. . . .

The court concluded that although defendant's activity was intentionally coercive of Kimball and disrupted Kimball's business relationship with plaintiff, "[t]he departure of Kimball's crew from the Rath job was not the result of any unlawful behavior or object of the union up to that time." (Conclusion of Law No. 3.)

Plaintiff asserts that the lower court findings indicate an unlawful secondary object in violation of § 8(b)(4)(ii).

Defendant contends that Campbell's statements are protected by § 8(c), 29 U.S.C. § 158(c).[9] Defendant also asserts that the district court finding of union responsibility for Campbell's statements to Karl Gould is clearly erroneous. Finally, defendant asserts that the trial court properly found that the departure of Gould was not the result of an unlawful union object.

[4] First, defendant's argument that Campbell's statements are protected by § 8(c) is without merit. The Court in *Electrical Workers,* 341 U.S. 694, 71 S.Ct. 954, 95 L.Ed. 1299 (1951), held that § 8(c) does not extend protection to speech or picketing in furtherance of unfair labor practices such as are defined in § 8(b)(4). The Court stated that the "general terms of § 8(c) appropriately give way to the specific provisions of § 8(b)(4)." 341 U.S. at 705, 71 S.Ct. at 960. See also, *NLRB v. Local 3, Electrical Workers, AFL–CIO,* 477 F.2d 260, 266 (2d Cir. 1973), cert. denied, 414 U.S. 1065, 94 S.Ct. 572, 38 L.Ed.2d 470; *Wine & Liquor Salesmen & A. Wkrs. Loc. 195 v. NLRB,* 146 U.S.App.D.C. 383, 452 F.2d 1312 (1971).

■ Defendant's assertions about the validity of the trial court's rulings on the responsibility of defendant for Campbell's speech raises a more difficult question. Union responsibility under § 303 for the acts of its members and officers is measured by reference to ordinary doctrines of agency. *United Mine Workers v. Gibbs,* 383 U.S. 715, 736, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *Mason-Rust v. Laborers' International Union, Local 42,* 435 F.2d 939, 943 (8th Cir. 1970); *International L. & W. Union v. Hawaiian Pineapple Co.,* 226 F.2d 875 (9th Cir. 1955), *cert. denied.,* 351 U.S. 963, 76 S.Ct. 1026, 100 L.Ed. 1483. The district court found that defendant was responsible for Campbell's actions since Koebler, Sr., the surrogate of the duly constituted official Chabucos, watched as Campbell addressed Gould. However, as defendant correctly points out, there was no evidence that John Koebler, Sr., heard what Campbell told Gould.[10] In addition, the record indicates that Campbell acted spontaneously and on his own authority.[11] Campbell had never been appointed to act as a picket. Thus, we are not convinced that the union should be held responsible for Campbell's statements.

■ We need not decide, however, whether the trial court's finding of fact on the responsibility of the union is clearly erroneous. Even if we assume that defendant is responsible for Campbell's statements to Gould, we would nonetheless find that such statements do not evidence an unlawful union object.

The basic content of Campbell's statement to Gould was that union people should honor a picket line (Tr. 18–19). Campbell did not threaten secondary pressure in order to force Gould into removing the Kimball crew.

---

**9.** § 8(c), 29 U.S.C. § 158(c), provides:

(c) The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit.

**10.** In response to a question as to whether Campbell was on the picket lines on the morning of June 29, 1974, John Koebler, Sr., stated, "I did not see John Campbell there." (Tr. 104.)

**11.** Campbell twice testified that he was only telling Gould what he (Campbell) thought of Gould coming on the picket line (Tr. 112, 114). There is no indication in the record that Campbell was in fact expressing his own opinion on behalf of the defendant.

Similarly, there is no indication in the record that Gould, in removing the Kimball crew, believed that defendant through Campbell was directing secondary pressure at Kimball. On the contrary, Gould testified that he withdrew the Kimball crew because he was concerned that trouble might result if hotheaded Kimball employees heard Campbell's language (Tr. 12, 18). Gould realized that Kimball employees were caught between plaintiff and defendant and he took the precaution of removing his crew "to keep it that way without any problems of any kind." (Tr. 20.)

■ "Some disruption of business relationships is the necessary consequence of the purest form of primary activity." *Operating Engineers*, 400 U.S. at 304, 91 S.Ct. at 407. Although the impact of primary activity on neutral employers may be severe, the picketing is protected as long as the object is to put pressure on the primary employer. *Woodwork Manufacturers v. NLRB*, 386 U.S. 612, 627, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967); *Ramey Const. Co., Inc. v. Local 544, Painters, Etc.*, 472 F.2d 1127, 1131 (5th Cir. 1973).

As the trial court found, Campbell's speech may have coerced Gould. In light of the spontaneous nature of the comments, the lack of direct involvement by defendant and the efforts by defendant to limit the effects of the picketing to the primary employer, we cannot say, however, that Campbell's comments indicate a secondary union object.

3. ALLEGED COERCION OF VIRGIL RATH

■ On June 25, 1974, Brian Koebler followed John Campbell and several ironworkers onto the job site. Koebler stopped and confronted Virgil Rath after he entered the job site. Koebler told Rath that he (Rath) was the cause of the trouble because he had hired cheap labor. Koebler also told Rath that the only reason he did not physically attack Rath was that he (Rath) was too old.

The lower court stated in its Findings of Fact that "the invasion by defendant's people included violent conduct toward the representative of the project owner. . . ." The lower court also indicated that the invasion of the job site was intentionally coercive of Rath. In its Conclusions of Law, the trial court found:

4. The inexcusable violence and trespass undertaken by the union group, without protest from the union, was primary against Helgesen, and all incidents involving others in this situation were incidental thereto.

Plaintiff argues that the statements to Rath were coercive and disclose a secondary object. Plaintiff asserts that the statements cannot properly be viewed as being incidental to primary activity.

Although Koebler's statement was, as the lower court found, coercive of Rath, we again do not believe that a secondary object is thereby shown. On the contrary, Koebler's statement indicates only that Koebler blamed Virgil Rath for the physical violence between the out of work ironworkers and the employees of plaintiff, the primary employer. The threat by Koebler of physical violence because of anger with Virgil Rath for having created a situation where violence between the union and the primary employer could occur also does not convince this court that defendant acted with secondary object.[12]

We agree with defendant that Koebler's statement must be placed in the context in which it occurred. The invasion of the job site was directed at employees of the primary employer. Physical violence was confined to employees of the primary employ-

---

12. The object of the union rather than the presence or absence of violence determines whether § 8(b)(4) has been violated. *NLRB v. Rice Milling Co.*, 341 U.S. 665, 672, 71 S.Ct. 961, 965, 95 L.Ed. 1277 (1951). The Court stated:

The substitution of violent coercion in place of peaceful persuasion would not in itself bring the complained-of-conduct into conflict with § 8(b)(4). It is the object of union encouragement that is proscribed by that section, rather than the means adopted to make it felt. 341 U.S. at 673. (Footnote omitted.)

er. Only property of the primary employer was damaged. The actions of the union, therefore, were directed at the primary employer alone.

Thus, we agree with the lower court that the comments to Virgil Rath do not indicate that the union acted with a secondary object.

### CONCLUSION

For the foregoing reasons, the ruling of the district court that defendant is not liable to plaintiff under § 303 is hereby affirmed.

AFFIRMED.