# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs November 12, 2014

## STATE OF TENNESSEE v. BOBBY DANIEL PETTIE

**Appeal from the Circuit Court for Bedford County**
**No. 17678     Lee Russell, Judge**

---

**No.  M2014-00113-CCA-R3-CD - Filed January 28, 2015**

---

The Defendant, Bobby Daniel Pettie, was found guilty by a Bedford County Circuit Court jury of initiating the manufacture of methamphetamine, a Class B felony, promotion of methamphetamine manufacture, a Class D felony, possession of a firearm during the commission of a dangerous felony, a Class D felony, and possession of methamphetamine, a Class A misdemeanor.  *See* T.C.A. §§ 39-17-435 (2014), 39-17-433 (2014), 39-17-1324 (2014), 39-17-418 (2014).  The trial court sentenced the Defendant to sixteen years for initiating the manufacture of methamphetamine, six years for promotion of methamphetamine manufacture, six years for possession of a firearm during the commission of a dangerous felony, and eleven months, twenty-nine days for possession of methamphetamine.  The court ordered the initiating the manufacture of methamphetamine and the promotion of methamphetamine manufacture sentences be served concurrently with each other and consecutively to the possession of a firearm during the commission of a dangerous felony and to the possession of methamphetamine sentences, for an effective sentence of twenty-two years, eleven months, and twenty-nine days.  On appeal, the Defendant contends that (1) the evidence is insufficient to support his convictions, (2) the trial court erred by denying his motion to suppress, and (3) his sentence is excessive.  We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and CAMILLE R. MCMULLEN, JJ., joined.

Donna Orr Hargrove, District Public Defender; Andrew Jackson Dearing III (on appeal, at trial, and at sentencing), Assistant District Public Defender; Jennifer Lenore Fiola (at motion for new trial hearing), Assistant District Public Defender; and Alicia Nicole Napier (at suppression hearing), Shelbyville, Tennessee, for the appellant, Bobby Daniel Pettie.

Robert E. Cooper, Jr., Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Robert Carter, District Attorney General; and Richard A. Cawley (at trial and suppression hearing) and Michael D. Randles (at motion for new trial hearing), Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

This case arises from a traffic stop of the Defendant by Shelbyville Police Officer Shane George on June 26, 2012. At the trial, Officer George testified that he was assigned to the drug task force and was stopped at a traffic light when he saw a Harley-Davidson motorcycle. The driver of the motorcycle was wearing a chrome helmet, a bandana, and a black jacket. Although it was dark outside, the driver was wearing dark-colored sunglasses. The driver's description matched that of a person who had been observed by a Dollar General Market employee making suspicious purchases earlier in the day. When the traffic light turned green, Officer George followed the motorcycle but was unable to obtain a license plate number because the tag was vertical.

Officer George testified that as he followed the motorcycle, he saw it weave within its lane of travel, speed up, and abruptly slow down. He continued following the motorcycle, and he saw it abruptly move from the "fast lane" to the "slow lane." He said another vehicle in the slow lane had to apply its brakes to "make a safe distance from the motorcycle." Based on the motorcycle's movements, he initiated a traffic stop. He identified the Defendant as the driver.

Officer George testified that the Defendant did not have a driver's license in his possession, although the Defendant claimed to have a valid license. He noted that not having a license in one's possession when operating a motor vehicle was an offense and that an officer had discretion to arrest the driver. The Defendant explained that he thought he left his license at his mother's house. Officer George told the Defendant that they could resolve the issue if the Defendant was willing to drive to his mother's house to retrieve his license while Officer George followed him. Officer George wanted to ensure the Defendant was who he claimed to be, had a valid license, and did not have any outstanding arrest warrants. He told the Defendant that he was not free to leave and that any deviation from the route to his mother's house would result in his arrest. Another officer arrived at the scene to assist Officer George, and all three men drove to the Defendant's mother's house.

Officer George testified that after arriving at the Defendant's mother's house, he and the Defendant walked to the door, but the Defendant did not enter the house. The Defendant said he might have left his driver's license inside his truck, which was parked nearby. As the Defendant searched the truck from the driver's side door, Officer George used his flashlight

to look through the passenger-side window to help search and to "keep an eye" on the Defendant. The Defendant did not find his license. Officer George did not recall if the Defendant used a key to enter the truck.

Officer George testified that he saw a box in the truck's backseat containing a gallon-size metal container of Coleman camping fuel and that he considered the item suspicious in light of the Defendant's ammonium nitrate purchase earlier that day from the Dollar General Market. He said the two items were used to manufacture methamphetamine. The Defendant walked toward his mother's house to look for his driver's license, and Officer George told the Defendant that he would permit the Defendant to look inside the house on the condition that the Defendant permit Officer George to enter the house. As the Defendant opened the door and stood in the threshold, he told Officer George that he could not permit him to enter the house because it belonged to his mother. At that time, Officer George smelled the odors of camping fuel and acid coming from inside the house, which he associated with the manufacture of methamphetamine based on his experience and training.

Officer George testified that he grabbed the Defendant's arm, told him to step outside the house, and told him to sit on the steps. The Defendant complied. Officer George read the Defendant his *Miranda* rights while in the presence of Officer Shelton. Upon questioning, the Defendant denied any methamphetamine manufacture inside the house. The Defendant consented to a search of his truck. Although the truck was now locked, Officer George used his flashlight to look inside the truck and inside the truck bed. He saw two clear plastic garbage bags. He saw that one of the garbage bags contained a green-colored bottle, which "was pressed somewhat flat." He saw the "remnants of the lab in the bottom of the bottle." He also saw a twenty-ounce drink bottle, which contained the remnants of a "gasser" and sulfuric acid. He said that in this instance, the gasser was rock salt.

Officer George testified that the green bottle contained everything used to manufacture methamphetamine and that the bottle was called "a one pot." He identified coffee filters inside the trash bags that were used to separate the methamphetamine from the oil and said the filters contained a residue from the filtering process. He also identified a hole in the cap of the bottle, which he said was used to move the gas from the container with the rock salt and acid to the container with the camping fuel oil. He said the gas caused the methamphetamine to crystalize in the oil and to settle to the bottom of the container.

Officer George testified that he smelled sulfuric acid coming from the twenty-ounce bottle. He said the bottle could be reused with additional rock salt and sulfuric acid to make more methamphetamine and agreed the bottle was ready for use. He identified "pink balls of junk" in the bottom of the bottle and said that the balls contained sodium hydroxide, ammonium nitrate, and pseudoephedrine, which were used to make methamphetamine. He

-3-

said the "dark specks" in the bottom were lithium from batteries used in the manufacture process. He identified the one-quarter-inch tube used to connect the two containers. He concluded that he had found a one-pot or shake-and-bake methamphetamine laboratory.

Officer George testified that he explained to the Defendant what he had found inside the bed of the Defendant's truck and that he was under arrest. The Defendant stated that he had been in town a couple of weeks and had been staying with his mother while he finished moving from Alabama to Tennessee. He owned the motorcycle and the truck. The Defendant admitted to Officer George that he used the items in the truck to manufacture methamphetamine while in Alabama and that he transported the items to Tennessee. Officer George did not believe that the Defendant transported the materials from Alabama, and he asked if the Defendant had anything inside the house. The Defendant told him to look inside the toolbox. The Defendant and Officer George entered the house together to obtain the toolbox, which contained items commonly used in the manufacture process. Officer George identified black latex gloves, coffee filters, sulfuric acid, a coffee/spice grinder containing pseudoephedrine residue, a Thermos, a funnel, two jars containing sodium hydroxide, cutters, a pair of pliers wrapped in electrical tape, two sets of digital scales, a bag containing small Ziploc bags, and an unopened pack of lithium batteries.

Officer George testified that the pliers were probably used to manipulate the hose or pull the lithium from the batteries. He said the scales had residue on them, and the Defendant stated that the scales were used to weigh the materials used in the manufacture process and to weigh the finished product. He said the small Ziploc bags were the size of jewelry bags and were indicative of someone packaging drugs for redistribution. He said the grinder was used to break down the pseudoephedrine before adding it to the mixture in order to quicken the manufacture process, and he noted the grinder contained pseudoephedrine residue. He said the Defendant admitted he owned the toolbox and its contents.

Officer George testified that the Defendant also told him about a few jars inside the house that were related to the manufacture process. The Defendant pointed to a pint-sized Mason jar, which contained Coleman camping fuel, and to a larger Mason jar, which contained methamphetamine residue. The Defendant admitted to using the methamphetamine in the larger jar and said he last used it the previous day. Officer George said the jar he identified as Coleman camping fuel might have been meth oil, which contained methamphetamine before it crystalized. He said the field test he used was for dry materials, not liquids, and as a result, he could not determine whether the jar contained fuel or meth oil. He said the material was not sent to the Tennessee Bureau of Investigation (TBI) Crime Laboratory because the laboratory discouraged submission of volatile, flammable, and corrosive substances. He said the Defendant seemed to have left the jar in plain view without thinking.

Officer George testified that the Mason jar found inside the house containing the methamphetamine residue was used to filter the Coleman fuel because methamphetamine was found at the bottom of the jar. He said a Mason jar was not a storage container because it was difficult to obtain the finished product from the bottom of the jar. He took a sample from the jar and sent it to the TBI laboratory for analysis. He said the Defendant also directed him toward a black nylon case inside the house, which contained a brown glass vial containing methamphetamine. He obtained a sample and sent it to the TBI laboratory for analysis.

Officer George testified that he found a loaded twelve-gauge shotgun under the rear passenger seat of the Defendant's truck. Latex gloves were also found inside the truck. He identified a bucket placed just outside the house that contained clear tubing under a yellow bag. He also saw unopened cold packs containing ammonium nitrate with the Dollar General logo.

Officer George testified that he interviewed the Defendant after he collected the evidence and seized the Defendant's vehicles. Although portions of the recorded interview were played for the jury, the recordings submitted with the appellate record are from pretrial court appearances and do not include Officer George's interview of the Defendant. Officer George testified that he and the Defendant discussed the digital scales and plastic bags found at the scene. He told the Defendant that the scales and bags were indicative of someone selling drugs, and the Defendant denied selling drugs. The Defendant claimed he was "producing" drugs for his personal use. They discussed whether the Defendant was trading finished methamphetamine for boxes of Sudafed because the State limited the amount that could be purchased within a thirty-day period and because of the national registry of people who purchased it. The Defendant claimed that he had not obtained any Sudafed in about one year and that the three boxes his girlfriend purchased every thirty days were enough for him to "get by" just for himself.

Officer George testified that the Defendant told him that he had been in Tennessee for about two weeks and that his mother had lived in Tennessee for about one year. The Defendant admitted to using methamphetamine the previous day. The Defendant stated that he moved from Alabama to get away from methamphetamine but that he was still using drugs.

Officer George testified that they discussed whether methamphetamine was made inside the Defendant's mother's house and that he told the Defendant that he thought drugs were "cooked" inside the house. Officer George stated that all the evidence found at the scene, including the trash inside the truck bed, the open container of camping fuel inside the house, the finished methamphetamine inside the house, the ammonium nitrate and tubing in

the trash can at the door, and the "fresh" odor inside the house suggested to him that methamphetamine was made inside the house. He asked the Defendant about the fuel in the Mason jar. The Defendant explained that the jar had a lid when it was inside his toolbox but that he removed the lid and the finished methamphetamine when he entered the house. The Defendant claimed he was "sloppy" for leaving the jar open.

Officer George testified that the Defendant admitted to using methamphetamine the day of his arrest. Officer George asked the Defendant to tell him how many times he made methamphetamine within a thirty-day period, and the Defendant said fifteen times because he was "cooking" only for himself. The Defendant then stated that he probably made methamphetamine about thirty times when he and his girlfriend used the drugs. He was paying non-drug users about $30 and drug users about $20 per box of Sudafed.

Officer George testified that the Defendant denied selling methamphetamine and giving away the drugs. The Defendant later said, though, that he did not give away the drugs. Officer George testified that the Defendant never denied making methamphetamine in Alabama. He did not believe the Defendant transported the trash from Alabama and said he thought the "actual production process" occurred at the Defendant's mother's house. He said that the most important item the person who made methamphetamine wanted to dispose of quickly was the one-pot gasser because possessing that item usually resulted in criminal liability. He thought that the Defendant intended to dispose of the evidence quickly but had not yet done so. He also noted the wet coffee filters in the garbage bag inside the truck bed, the smell coming from the house, and the materials found inside the house, including the open jar of Coleman camping fuel and the finished methamphetamine.

On cross-examination, Officer George testified that the items in the garbage bags inside the truck bed showed an initiation of the manufacture process. He noted, though, that once the chemicals combined, the reaction continued. He equated the combining of the materials in the one-pot gasser to the process of making bread from dough. He denied the items in the garbage bags had been thrown away but agreed the garbage bags also contained french fries and hamburger wrappers. He also said the mixed chemicals that had been used to manufacture methamphetamine could be used again in another process.

Officer George testified that he did not write the Defendant a citation during the traffic stop because he gave the Defendant an opportunity to provide his driver's license and because he did not know whose name to place on a citation. He read the Defendant his *Miranda* rights in the presence of Officer Shelton after smelling the odors coming from the house. He agreed that the Defendant claimed the methamphetamine was made in Alabama, that the Defendant had an Alabama driver's license, and that the Defendant's truck and motorcycle were registered in Alabama.

Officer George testified that he did not tell the Defendant that he would "help him out" if the Defendant permitted him to search the toolbox and that he told the Defendant that he would talk to the prosecutor about his cooperation. He noted the prosecutor might have taken the Defendant's cooperating into consideration relative to any plea offers. He said he told the Defendant that he could not make promises to help the Defendant. He said the Defendant opened the toolbox and agreed the coffee filters inside were unused. He denied the items inside the toolbox were more indicative of promotion of methamphetamine manufacture rather than initiation because the white residue in the grinder was indicative of grinding pseudoephedrine pills for the extraction process. He said the toolbox contained partial bottles of sulfuric acid and sodium hydroxide. He concluded that these components had been used to manufacture methamphetamine. He said the grinder with the pill residue was the beginning, or initiation, of the manufacture process.

Officer George testified that the pseudoephedrine registry log showed the Defendant purchased pseudoephedrine in Alabama until his arrest for the current charges and that he began purchasing it in Tennessee while released on bond pending the trial. Officer George searched the Defendant during the traffic stop and found no methamphetamine, pseudoephedrine, or items used to manufacture drugs. He agreed the Defendant was not under the influence and could drive safely. He said the shotgun was found under the rear passenger-side seat of the Defendant's truck and agreed the Defendant said that he did not know the gun was in the truck and that it belonged to a friend who was helping him move. Officer George questioned the truth of the Defendant's explanation. He agreed, though, that the gun did not have "double-aught buckshot or slugs" in the shell. He said that although he believed methamphetamine was manufactured inside the house, he did not know positively. He agreed the house was not quarantined.

On redirect examination, Officer George testified that the coffee filters inside the toolbox were dry and that the filters inside the garbage bag were used to manufacture methamphetamine. He said he found the box of materials inside the truck on the backseat and the gun underneath the seat.

Shelbyville Police Officer Jody Shelton testified that on June 26, 2012, he saw Officer George performing a traffic stop and that he stopped to assist. He ran a driver's license check on the Defendant's name through dispatch, which showed a valid license. His equipment, though, could not display a photograph of the Defendant. As a result, he was unable to verify the Defendant's identity. He followed Officer George and the Defendant to the Defendant's mother's house. He did not participate in Officer George's interview of the Defendant but was present when Officer George read the Defendant his *Miranda* rights. He heard the Defendant waive his rights and agree to answer questions. He said the Defendant admitted to possessing the components of a methamphetamine laboratory. The

Defendant also said the components were used to manufacture methamphetamine in Alabama. Officer Shelton saw the Defendant show Officer George the toolbox and the open Mason jar inside the house. He did not recall if the Defendant admitted to using methamphetamine but said the Defendant stated he moved from Alabama to get away from people who were associated with methamphetamine. He said the Defendant was cooperative and cordial. On cross-examination, Officer Shelton testified that he did not recall if the Defendant had an Alabama or Tennessee driver's license.

TBI Special Agent Laura Cole, an expert in forensic chemistry, testified that she analyzed the evidence in this case. She analyzed a small amount of tan powder from the Mason jar and concluded it was methamphetamine. She also analyzed the substance found in the brown vial and concluded it was methamphetamine. The combined substances weighed 0.05 grams. On cross-examination, she stated that 0.05 grams was a "minuscule" amount.

Upon this evidence, the jury found the Defendant guilty of initiating the manufacture of methamphetamine, promotion of methamphetamine manufacture, possession of a firearm during the commission of a dangerous felony, and possession of methamphetamine. The trial court imposed partial consecutive sentencing for an effective sentence of twenty-two years, eleven months, and twenty-nine days. This appeal followed.

# I

## Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support all of his convictions, except possession of methamphetamine. The State responds that the evidence is sufficient. We agree with the State.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given to the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see also State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

## A. Initiating the Manufacture of Methamphetamine

Relative to initiating the manufacture of methamphetamine, "[i]t is an offense for a person to knowingly initiate a process intended to result in the manufacture of any amount of methamphetamine." T.C.A. § 39-17-435(a) (2014). Initiate means "to begin the extraction of an immediate methamphetamine precursor from a commercial product, to begin the active modification of a commercial product for use in methamphetamine creation, or to heat or combine any substance or substances that can be used in methamphetamine creation." *Id*. § 39-17-435(c).

The Defendant argues that the evidence fails to show that he mixed chemicals to initiate the manufacture of methamphetamine in Tennessee. The record reflects that Officer George found the remnants of a methamphetamine laboratory and the remnants of a gasser inside the bed of the Defendant's truck. Officer George said that the two-liter bottle contained everything needed to manufacture methamphetamine. Inside the clear garbage bags were wet coffee filters used to separate the methamphetamine from the camping fuel. The filters contained residue from the filtering process. Officer George found inside the garbage bags a twenty-ounce bottle containing rock salt and sulfuric acid residue. He said the twenty-ounce bottle was used to move the gas from the container with the rock salt and sulfuric acid to the container with the camping fuel. The gas caused methamphetamine to form and settle to the bottom of the container with the fuel. He said the twenty-ounce bottle could be used again with the addition of more rock salt and sulfuric acid. Officer George also identified sodium hydroxide, ammonium nitrate, and pseudoephedrine, which were used to manufacture methamphetamine, in the bottom of one of the bottles. Also in the garbage bags were tubing used to connect the two bottles and portions of lithium batteries used in the manufacture process.

The Defendant admitted to making methamphetamine in Alabama, but the jury was free to discredit the Defendant's statement and to conclude that the Defendant made methamphetamine at his mother's house in Tennessee. The Defendant claimed that he had been in Tennessee for two weeks and that he brought the garbage bags from Alabama. We note that the Defendant admitted to using methamphetamine the previous day. The coffee filters, though, inside the garbage bags used in the manufacture process were still wet at the time of the Defendant's arrest. Additionally, a Coleman fuel can was inside the truck, and

a toolbox inside the house contained latex gloves, coffee filters, partial bottles of sulfuric acid and sodium hydroxide, a grinder containing pseudoephedrine residue, scales, lithium batteries, and cutters. We note that the Defendant told Officer George that the scales were used, in part, to weigh the finished product and that the scales had methamphetamine residue. Officer George testified that the grinder was used to break down the pseudoephedrine before being added to the mixture to manufacture methamphetamine and that the grinder contained pseudoephedrine residue. He said adding pseudoephedrine began the extraction process.

Relative to the Mason jars found inside the house, Officer George testified that the jar containing the methamphetamine residue was not a storage container for the finished product but instead was used to filter the methamphetamine and the camping fuel because the finished product was difficult to remove from the bottom of a Mason jar. Officer George concluded that methamphetamine was made inside the house based on the items found inside the garbage bags, the open Mason jar of camping fuel found inside the house, the methamphetamine found inside the house, the ammonium nitrate and tubing found in the trash can just outside the door leading into the house, and the odor coming from the house. He also stated that most people disposed of the items found in the garbage bags as soon as possible because possessing a one-pot gasser generally resulted in criminal liability, and he thought the Defendant intended to dispose of the garbage bags quickly. The evidence is sufficient that the Defendant initiated the manufacture process in Tennessee.

### B. Promoting the Manufacture of Methamphetamine

A person is guilty of promoting the manufacture of methamphetamine if he or she "[s]ells, purchases, acquires, or delivers any chemical, drug, ingredient, or apparatus that can be used to produce methamphetamine, knowing that it will be used to produce methamphetamine, or with reckless disregard of its intended use." *Id*. § 39-17-433(a)(1) (2014). Although the Defendant claims his conduct did not constitute the promotion of the manufacture of methamphetamine, he fails to explain why. *See* T.R.A.P. 27(a)(7)(A); *see also* Tenn. Ct. Crim. App. R. 10(b). In any event, the Defendant told Officer George that he produced methamphetamine for his personal use and that he acquired pseudoephedrine from his then-girlfriend, who purchased the pseudoephedrine in order for him to manufacture enough methamphetamine for thirty days. He also told Officer George that he paid non-drug users about $30 and drug users $20 per box of Sudafed they obtained for him. The record also shows that Officer George found plastic tubing, empty packages of ammonium nitrate with the Dollar General logo, and Coleman fuel and that the three items were used to manufacture methamphetamine. The evidence is sufficient.

### C. Possession of a Firearm

"It is an offense to possess a firearm with the intent to go armed during the commission of or attempt to commit a dangerous felony." T.C.A. § 39-17-1324(a) (2014). Initiating the process to manufacture methamphetamine is a dangerous felony. *See id.* at (i)(1)(K). The evidence must show a defendant's intent or purpose of going armed. *Cole v. State*, 539 S.W.2d 46, 49 (Tenn. Crim. App. 1976); *see Hill v. State*, 298 S.W.2d 799, 301 (Tenn. 1957). "Intent may be inferred from both direct and circumstantial evidence." *State v. Washington*, 658 S.W.2d 144, 146 (Tenn. Crim. App. 1983); *see generally Graham v. State*, 404 S.W.2d 475 (Tenn. 1966). Possession may be actual or constructive. *State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001). Constructive possession requires a showing that a defendant had "the power and intention at a given time to exercise dominion and control over . . . [the item] either directly or through others." *State v. Cooper*, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987) (internal quotations and citation omitted). "'In essence, constructive possession is the ability to reduce an object to actual possession.'" *State v. Williams*, 623 S.W.2d 121, 125 (Tenn. Crim. App. 1981) (quoting *United States v. Martinez*, 445 F.2d 495, 498 (5th Cir. 1979)).

The Defendant argues that the proof fails to show that he possessed the shotgun with the intent to go armed during the commission of a felony. Although the gun was under the passenger seat of his truck, the record shows that the Defendant had constructive possession of it. The containers actively used in a methamphetamine laboratory were found in garbage bags inside the truck bed, and a Coleman fuel can and rubber gloves were found inside the truck. The Defendant admitted that the garbage bags were his, and the jury rejected his claim that he only manufactured methamphetamine in Alabama. Officer George believed that the Defendant intended to dispose of the garbage bags quickly but had not yet done so. Disposing of the garbage bags was important to the manufacture process because, as Officer George testified, possession of the items in the bags usually resulted in criminal liability. The Defendant was in constructive possession of the gun, and the jury was free to discredit the Defendant's explanation that a friend left the gun in his truck and that he did not know the gun was there. We note the record shows that the truck was unlocked when the Defendant looked for his driver's license but that it was later locked and the keys missing after he consented to a search of the truck. The evidence is sufficient. The Defendant is not entitled to relief on this basis.

## II

### Motion to Suppress

The Defendant contends that the trial court erred by denying his motion to suppress. He argues that although Officer George had probable cause to initiate a traffic stop, he unlawfully "placed the [D]efendant under custodial arrest" and that all the evidence at the Defendant's mother's house should have been suppressed. In essence, he argues that the officer should have issued a citation and released him. The State responds that the Defendant's argument was not raised in the trial court and that he is not entitled to plain error relief because it was reasonable for Officer George to reject the Defendant's "proof of identification and place him under arrest until he could show a license." We conclude that the Defendant is not entitled to relief.

A trial court's findings of fact on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996); *State v. Jones*, 802 S.W.2d 221, 223 (Tenn. Crim. App. 1990). Questions about the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Odom*, 928 S.W.2d at 23. The prevailing party is entitled to the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998); *see State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001). A trial court's application of the law to its factual findings is a question of law and is reviewed de novo on appeal. *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997). In reviewing a trial court's ruling on a motion to suppress, this court may consider the trial evidence as well as the evidence presented at the suppression hearing. *See State v. Henning*, 975 S.W.2d 290, 297-99 (Tenn. 1998); *see also State v. Williamson*, 368 S.W.3d 468, 473 (Tenn. 2012).

At the suppression hearing, Shelbyville Police Officer Shane George testified consistently with his previously recited trial testimony. He agreed the Defendant was being detained during the drive to the Defendant's mother's house. He said Officer Shelton arrived at the house while the Defendant was looking inside his truck for his driver's license and left the scene after the Defendant was taken into custody.

Officer George testified that the Defendant did not consent to his entering the house when the Defendant was looking for his driver's license. He denied the truck was locked when they arrived at the scene and said the Defendant looked inside the truck for his license. He assumed the Defendant locked the truck after looking for his license because it was locked later. He said that while the Defendant looked for his license inside the truck, he

-12-

looked through the window with his flashlight but denied looking inside the truck bed. He agreed the Defendant was being detained at that time because he had committed an offense for which he could have been arrested by not having a driver's license on demand during a lawful traffic stop. He said he was simply providing the Defendant the opportunity to find his license. He said that if his license "checked out," he would have been allowed to either issue him a citation or release him without a citation.

Officer George testified that he probably could have contacted a judge about the can of Coleman camping fuel in the backseat of the Defendant's truck but that based on his experience, it would have been futile to attempt to obtain a search warrant solely based on the fuel can. He said he did not ask the Defendant to sign a consent to search form. On redirect examination, he stated the Defendant claimed that he had been at his mother's house for two weeks, that he had a home in Alabama, and that he was in the process of moving to Tennessee.

Shelbyville Police Officer Jody Shelton testified consistently with his previously recited trial testimony.

The trial court denied the motion to suppress the evidence found at the Defendant's mother's house. Relative to the traffic stop, the court found that Officer George had probable cause to stop the Defendant based on his erratic driving and speeding. The court found that after the initial stop, the Defendant was obligated to provide identification, that the Defendant was not able to do so, and that the officer provided the Defendant the opportunity to obtain his driver's license at his mother's house. Relative to the search of the truck, the court found that the Defendant consented and that the items seen inside the truck were in plain view. Relative to the house, the court found that the evidence showed the Defendant had been a resident for about two weeks, although he had a residence in Alabama. The court found that the Defendant consented to the search of the house and that the Defendant had the authority to provide the consent.

The Defendant argued in his motion to suppress that (1) the search and seizure of the items in the garbage bags was an improper warrantless search, (2) he did not consent to the warrantless search of his truck or his mother's house, and (3) Tennessee was not the proper venue for the initiation charge because the alleged offense was committed in Alabama. The State correctly notes in its brief that the Defendant did not argue at the suppression or motion for a new trial hearings that the evidence should have been suppressed because Officer George should have issued a citation for the Defendant's lack of identification and released him. He presents this argument for the first time on appeal. This court has stated that "an accused may not litigate an issue on one ground, abandon that ground post-trial, and assert a new basis" on appeal. *State v. Matthews*, 805 S.W.2d 776, 781 (Tenn. Crim. App. 1990);

-13-

*see* T.R.A.P. 3(e) (A defendant is entitled to an appeal provided that "in all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission . . . of evidence . . . unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived."). As a result, this court is limited to plain error review. *See* T.R.A.P. 36(b) ("When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial[.]").

The Tennessee Supreme Court has determined the criteria for establishing plain error, which requires a showing that

> (a) the record . . . clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

*State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994). Each of the five factors must be established and "complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *State v. Smith*, 24 S.W.3d 274, 283 (Tenn. 2000). Reversal requires an error "of such a great magnitude that it probably changed the outcome of the trial." *Adkisson*, 899 S.W.2d at 642. Likewise, the error in question should be one that "had an unfair prejudicial impact which undermined the fundamental fairness of the trial." *Id*.

We conclude that the Defendant has failed to establish plain error. He concedes in his brief that critical to the issue he now raises is what constitutes "satisfactory evidence of identification" pursuant to the "cite and release" statute and that the issue is one of first impression. *See* T.C.A. § 40-7-118(c)(3) (2012) (stating that a citation cannot be issued if "[t]he person arrested cannot . . . offer satisfactory evidence of identification"). In *State v. Walker*, 12 S.W.3d 460, 466 (Tenn. 2000), our supreme court discussed the identity exception to the cite and release statute, requiring a custodial arrest when the identity of a misdemeanant is in doubt. The court concluded that a police officer may arrest a misdemeanant when it is "objectively reasonable" to reject the information he or she has provided. *Id*. at 467. As a result, "the determination of whether verbal representations supply satisfactory evidence of identity must be made on a case-by-case basis." *Id*. In the present case, Officer George was unable to confirm the identity of the Defendant, who claimed to be an out-of-state person, and the officer's decision not to cite and release the Defendant was not objectively unreasonable. Therefore, the Defendant cannot establish that

a clear and unequivocal rule of law was breached. *See Adkisson*, 899 S.W.2d at 641-42. The Defendant is not entitled to plain error relief.

# III

## Sentencing

The Defendant contends that his sentence is excessive. He argues his effective sentence is disproportionate to the seriousness of the offenses and is not the least severe measure to achieve the purposes for which the sentences were imposed. The State responds that the sentences were proper. We agree with the State.

This court reviews challenges to the length of a sentence within the appropriate sentence range "under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). A trial court must consider any evidence received at the trial and sentencing hearing, the presentence report, the principles of sentencing, counsel's arguments as to sentencing alternatives, the nature and characteristics of the criminal conduct, any mitigating or statutory enhancement factors, statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee, any statement that the defendant made on his own behalf, and the potential for rehabilitation or treatment. *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991) (citing T.C.A. §§ 40-35-103 (2014), -210 (2014); *State v. Moss*, 727 S.W.2d 229, 236 (Tenn. 1986); *State v. Taylor*, 744 S.W.2d 919 (Tenn. Crim. App. 1987)); *see* T.C.A. § 40-35-102 (2014).

Likewise, a trial court's application of enhancement and mitigating factors are reviewed for an abuse of discretion with "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Bise*, 380 S.W.3d at 706-07. "[A] trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id*. at 706. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed . . . within the appropriate range" will be upheld on appeal. *Id.*

The abuse of discretion with a presumption of reasonableness also applies to the imposition of consecutive sentences. *State v. Pollard*, 432 S.W.3d 851, 859 (Tenn. 2013). A trial court has broad discretion in determining whether to impose consecutive service. *Id*. A trial court may impose consecutive sentencing if it finds by a preponderance of the evidence that one of the criterion is satisfied in Tennessee Code Annotated section 40-35-115(b)(1)-(7) (2014). In determining whether to impose consecutive sentences, though, a

trial court must ensure the sentence is "no greater than that deserved for the offense committed" and is "the least severe measure necessary to achieve the purposes for which the sentence is imposed." T.C.A. § 40-35-103(2), (4) (2014); *see State v. Desirey*, 909 S.W.2d 20, 33 (Tenn. Crim. App. 1995).

At the sentencing hearing, the presentence report showed that the Defendant had previous felony convictions in Alabama for two counts of third degree burglary and theft. The report showed that on August 28, 2006, the Defendant was found guilty of third degree burglary and sentenced to seven years in the Alabama Department of Correction. The offense date in the present case was June 26, 2012.

The Defendant graduated from high school and completed two months of classes at Tennessee Technology Center before his arrest. He reported employment from June 2009 to December 2010. The Defendant reported good physical and mental health and admitted to drinking alcohol between ages fifteen and twenty-five. He said he stopped drinking when a close friend died in a car accident. He abused pain medication between ages twenty-one and twenty-six. He reported that the opiate abuse ended as a result of his arrest and confinement in Alabama. The Defendant reported that he began using methamphetamine at age thirty, which continued until his arrest in the present case. The Defendant was married and had a son at the time of sentencing.

Shelbyville Police Officer Shane George testified that his work on the drug task force had focused on methamphetamine enforcement for the previous six years. He said that methamphetamine use had increased drastically in Bedford County during the thirteen years he had participated in the task force. He said that during his first year on the task force, he made one methamphetamine-laboratory-related arrest. He said that he made about six or seven arrests in 2013. He said the defendants he had previously prosecuted were mostly concerned about going to jail. He thought jail time would serve as a deterrent to someone who was in the business of initiating, promoting, or manufacturing methamphetamine. He recalled a female defendant whom he prosecuted for the manufacture of methamphetamine and who served her sentence. He said she told him that she had been sober almost six years and that a lengthy jail sentence was the best thing that ever happened to her.

On cross-examination, Officer George testified that he had no contact with the Defendant before the day of the traffic stop and that the Defendant said he lived in Alabama but was in the process of moving to Tennessee. He agreed that the Defendant was driving his motorcycle on the day of the offenses and that the shotgun was found in the Defendant's truck. Officer George found no weapons on the Defendant's person.

The Defendant testified that he was thirty-three years old and that he lived in Alabama before his arrest. He said he came to Tennessee to help move his mother, who lived in Bedford County. He said he was married and had a nine-month-old son, who he last saw four months previously. He admitted an addiction to methamphetamine for the previous three years and said he used it daily. He admitted during his presentence interview that he made methamphetamine but said it was only to support his personal habit. He denied selling methamphetamine.

The Defendant testified that he previously worked for Vulcan Plastics and Robin Rents and that he had several odd jobs, which included taking care of his mother and stepfather. He said he was either attending school or working most of his life. He said that he was studying "industrial electricity" when he was arrested and that he planned to continue his education in the future. Relative to the friend who lost his life in a car accident, the Defendant told the trial court that he blamed himself for his friend's death because he convinced his friend to drive that day.

The Defendant testified that he believed he needed to participate in a drug rehabilitation program and needed a structured life. He realized that he would always be an addict and that he needed help for the remainder of his life. He said his life was better when he had structure and noted he did not start using drugs until one and one-half years after he was released from prison in Alabama. He said he did well when he was under intensive supervision. He agreed he complied with all the conditions of his release until his arrest in the present case.

The Defendant testified that he had been in jail for six months and that he had thought about his situation. He said he had lost all self-respect because he had been through this previously. He had lost his dignity and integrity and said he brought shame and disappointment to his mother. He apologized to his mother and said he was most sorry that he had missed the opportunity to provide for his child.

The Defendant testified that he and trial counsel discussed the intense supervision associated with community corrections and that he wanted the opportunity to have structure in his life. He said that if he could not comply with the conditions of community corrections, he deserved to go to jail. He told the trial judge that he had lost sight of what was important and that since he had been sober, he realized what was important. He asked for the opportunity to provide for his son and promised he would "never be back up here."

On cross-examination, the Defendant testified that he resigned from Vulcan Plastic in December 2010 and that he worked at Robin Rents and performed odd jobs from 2010 until his arrest in the present case. He said his odd jobs included painting motorcycles,

helping his uncle, and caring for his mother. He agreed he did not have a steady job for some of that time but said he was in school. He said he resigned from Vulcan Plastic because he and another employee had a conflict.

The Defendant testified that his wife was addicted to methamphetamine and that before his arrest, she obtained methamphetamine from him. He agreed that he provided his wife with methamphetamine while she was pregnant, which was directly related to his son's developmental problems. He admitted to using methamphetamine to "get off" methadone.

The Defendant testified that although he received a seven-year sentence on August 28, 2006, for third degree burglary in Alabama, he was not on parole or probation at the time the present offenses were committed. He said that after serving thirty percent of his sentence, he was on parole for one year and that his sentence was finished after the year of parole. He said he had been released for four and one-half years. He denied that the parole officer supervised him for the full seven years. He denied that third degree burglary in Alabama involved a residence. He denied using methamphetamine while on parole.

Upon examination by the trial court, the Defendant testified that although Robin Rents confirmed his employment ended in April 2009, he left in early 2011 and began the industrial electrician program. He confirmed for the court that he was not on parole at the time he committed the present offenses. He said he began using methamphetamine about one and one-half years after his release in Alabama. He admitted to committing two burglaries and one theft before he began using methamphetamine. He said those convictions occurred while he was abusing opiates.

Alyssa Rooks, the Defendant's mother, testified that the Defendant was a loving father and that the baby loved the Defendant. She said that the baby recognized the Defendant's voice and that the Defendant spent time with the baby. She stated that since the Defendant's incarceration, he admitted he had a methamphetamine addiction. She said that after she was injured in a severe car accident in 2008, the Defendant moved into her Alabama home to care for her and her late husband, who suffered from cancer. She said that although the Defendant might not have been employed, he had a full-time job caring for them.

Ms. Rooks testified that the Defendant had been there for her since her husband died and that she depended upon him. She believed the Defendant needed treatment. She said that the Defendant could live with her if released and that anyone could inspect her house. She wanted the trial court to impose a structured sentence that involved education, substance abuse treatment, therapy, and a program to teach the Defendant how to reenter society. She wanted the Defendant to have a chance to have a life and said the person addicted to

methamphetamine was not the person she knew and loved. She knew the Defendant had decided to stay sober.

On cross-examination, Ms. Rooks denied knowing the Defendant was manufacturing methamphetamine at her house and denied seeing signs of drugs at her house. She was an agent with the United States Department of Agriculture and said she "wouldn't even go for that." She said that although she was surprised to learn the Defendant provided his pregnant wife with methamphetamine, she suspected the Defendant provided it to prevent his wife from getting it elsewhere. She denied helping the Defendant hide his truck from a repossession agency and said she did not know initially the truck was being repossessed. She said she told a detective where the truck was located after she knew what was happening.

The trial court found that the Defendant was a Range II offender based on two of the three Alabama felony convictions. Relative to enhancement factors, the court found that factor (1) applied based on the Defendant's previous convictions and his admitted criminal behavior. *See* T.C.A. § 40-35-114(1) (2014) ("The defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range[.]"). The court noted that the behavior most concerning was the Defendant's providing methamphetamine to his pregnant wife and stated that this conduct was significant. The trial court, though, refused to find that the Defendant was on parole at the time the present offenses were committed because the record failed to show Alabama's sentencing procedures. *See id.* § 40-35-114(13) (At the time the felony was committed, the Defendant was released on parole). The court noted that the Defendant did not request the application of mitigating factors and found that it did "not have to deal with them."

Based on the enhancement factors, the trial court sentenced the Defendant to sixteen years for initiating the manufacture of methamphetamine, six years for promotion of methamphetamine manufacture, six years for possession of a firearm during the commission of a dangerous felony, and eleven months, twenty-nine days for simple possession. The trial court noted that the Defendant was required to serve five of the six years for the firearm conviction and that our statutes required the six-year sentence to be served consecutively to any remaining sentences.

Relative to consecutive sentencing, the trial court found that the Defendant had an extensive criminal record and noted the seriousness of the present and previous convictions. Although the court found that the record did not justify complete consecutive service, it ordered partial consecutive service. The court ordered the initiating the manufacture of methamphetamine and the promotion of methamphetamine manufacture convictions be served concurrently but consecutively to the firearm and simple possession convictions, for an effective sentence of twenty-two years, eleven months, and twenty-nine days.

The trial court found that the presumption of alternative sentencing was overcome by the evidence and that confinement was necessary to protect society from the Defendant, who had a lengthy criminal history. The court noted the Defendant's criminal history predated his methamphetamine use. The court found that confinement was necessary to avoid depreciating the seriousness of the offenses. The court credited Officer George's testimony regarding the increasing prevalence of methamphetamine manufacture in Bedford County and found that confinement was necessary to deter others from committing similar offenses.

Although the trial court stated that the proof did not show that the Defendant was on parole in Alabama at the time of the offenses, it found that the present offenses were committed within the period of his sentence. It found that a "profound risk" existed showing the Defendant would commit another offense if he were released to probation. The court agreed the Defendant needed structure. The court found that community corrections would not provide sufficient structure and stated that the Defendant would live longer in confinement because of his multiple addictions.

The Defendant does not argue that the trial court improperly applied the enhancement factor or failed to apply any mitigating factors. The Defendant also does not argue that the court improperly ordered partial consecutive service. The basis of his contention is simply that his sentence is not appropriate given the facts in the record. He notes the State's scarce prison resources and argues the expenses would be better utilized for violent offenders.

The record reflects that the trial court considered the appropriate principles of sentencing and that it imposed within-range sentences for each conviction. Likewise, the court properly applied the enhancement factor based on the Defendant's previous felony convictions and his admitted criminal behavior. The court found, and the record supports, that confinement was necessary to avoid depreciating the seriousness of the offenses and to deter others from committing similar offenses in the community. The testimony shows the offenses involved were on the rise in Bedford County. We note that the Defendant was not eligible for community corrections or probation relative to the possession of a firearm during the commission of a dangerous felony conviction. *See* T.C.A. § 39-17-1324(e)(2) (2014). Likewise, the Defendant was not eligible for probation relative to the initiating the manufacture of methamphetamine conviction because his sentence was in excess of ten years. *See id.* § 40-35-303(a) (2014).

Relative to partial consecutive sentencing, the trial court stated that complete consecutive sentencing was not warranted by the evidence. It found, though, that the Defendant had an extensive record of criminal activity. *See id.* § 40-35-115(b)(2) (2014). The record supports the trial court's finding. The Defendant had three felony convictions for burglary and theft, and he admitted those offenses occurred when he was abusing opiates.

Likewise, he admitted to using methamphetamine daily and to providing the drug to his then-pregnant wife. The record fails to show that the trial court abused its discretion in its sentencing determinations. The Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____
ROBERT H. MONTGOMERY, JR., JUDGE